UNITED STATES of America,

v.

Stavros NIARCHOS, Ambrose Capparis, George Trypanis, George Emmanuel, Constantine Emmanuel, alias Costa Emmanuel, Mary Dracopoulos, David R. Dorn, Robert A. Murphy, Compania Internacional de Vapores Ltda., a corporation, North American Shipping and Trading Company, Inc., a corporation, Delaware Tanker Corporation, a corporation, Joseph E. Casey, E. Stanley Klein, Julius C. Holmes, American Overseas Tanker Corporation, a corporation, Defendants.

No. 685–53.

United States District Court
District of Columbia.

Sept. 9, 1954.

Leo A. Rover, Allen J. Krouse, J. Frank Cunningham, Howard F. Smith, Frederick W. Becker, Washington, D. C., for plaintiff.

Edward B. Williams, William E. Leahy, Wm. J. Hughes, Jr., Henry T. Rathbun, Washington, D. C., for defendants.

YOUNGDAHL, District Judge.

This is one of a series of cases arising out of the disposition of surplus vessels after the Second World War. At that time there were many surplus vessels which had been built to carry supplies and troops. As a result Congress passed The Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix, § 1735 et seq., which gave authority to the Maritime Commission to sell the vessels and set a price formula for the Commission to follow in

selling them. The Act is merely directory to the Commission. It contains no penal provisions. Among other things the Act provides that preference in the sale of the surplus vessels shall be given to citizens of the United States, 50 U.S. C.A.Appendix, § 1740, and adopts the definition of citizenship appearing in Section 2 of the Shipping Act of 1916 as amended[1]. Suspicion arose that some alien purchasers were misrepresenting their citizenship in order to obtain vessels, and on terms as favorable as those given to citizen purchasers. An investigation was initiated. It has resulted in thirteen indictments against an aggre-

gate of ninety-one defendants on the criminal side, and libel proceedings against many of the vessels on the civil side.

The present indictment arose from the following alleged facts. On December 19, 1947, defendant American Overseas Tanker Corporation, (AOTC), contracted to purchase five vessels from the Commission. AOTC wanted to transfer the vessels to Panamanian registry and flag. Under Section 9 of the Shipping Act of 1916, approval of the Commission is required before a vessel can be placed under foreign registry or flag.[2] And, Sec-

---

1. Section 3(g) of the Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix, § 1736 (g). The pertinent provisions in Section 2 of the Shipping Act of 1916, as amended 46 U.S.C.A. § 802, read:

"[Sec. 2] (a) That within the meaning of this Act no corporation, partnership, or association shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States, and, in the case of a corporation, unless its president and managing directors are citizens of the United States and the corporation itself is organized under the laws of the United States or of a State, Territory, District, or possession thereof, but in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.

"[Sec. 2] (b) The controlling interest in a corporation shall not be deemed to be owned by citizens of the United States (a) if the title to a majority of the stock thereof is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (b) if the majority of the voting power in such corporation is not vested in citizens of the United States; or (c) if through any contract or understanding it is so arranged that the majority of the voting power may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or, (d) if by any other means whatsoever control of the corporation is conferred upon or permitted to be exercised by any person who is not a citizen of the United States."

2. 46 U.S.C.A. § 808. Section 9 reads: "That any vessel purchased, chartered,

or leased from the United States Maritime Commission, by persons who are citizens of the United States, may be registered or enrolled and licensed, or both registered and enrolled and licensed, as a vessel of the United States and entitled to the benefits and privileges appertaining thereto: *Provided,* That foreign-built vessels admitted to American registry or enrollment and license under this Act, and vessels owned by any corporation in which the United States is a stockholder, and vessels sold, leased, or chartered by the commission to any person a citizen of the United States, as provided in this Act, may engage in the coastwise trade of the United States while owned, leased, or chartered by such a person.

"Every vessel purchased, chartered, or leased from the commission shall, unless otherwise authorized by the commission, be operated only under such registry or enrollment and license. Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein.

"*Except as provided in section 611 of the Merchant Marine Act, 1936, as amended, it shall be unlawful, without the approval of the United States Maritime Commission, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the*

tion 41 of the Shipping Act of 1916 provides that whenever approval of the Commission is required by Section 9, the approval may be given either absolutely or upon such conditions as the Commission prescribes.[3]

In the contract of December 19, 1947, the Commission gave its approval, as required by Section 9, to the transfer of each vessel to Panamanian registry and flag. However, as authorized by Section 41, the Commission attached a condition to its approval. The condition was: "The Buyer agrees that, with respect to each vessel, the American citizen ownership and Panamanian registry of the vessel shall not be changed without prior approval of the Commission, and that if in the judgment of the Commission the national interest so requires, the Buyer shall return the vessel to documentation under the United States flag".

Defendants have been indicted for violation of Sections 9 and 41 of the Shipping Act of 1916 and under 18 U.S.C. § 371 for conspiracy to violate these Sections. Section 41 makes it a crime to violate a condition attached to approval under Section 9. The Government alleges that the condition was in fact vio-

lated by the sale of the stock in AOTC to alien interests which did not satisfy the citizenship requirements in Section 2 of the Shipping Act of 1916. Section 9 makes it a crime to transfer vessels to foreign registry or flag without approval of the Commission. The Government also alleges that under Section 41 a result of violating the condition is to treat the original transfer to Panamanian registry and flag as though it had been done without the approval of the Commission, thereby causing a violation of Section 9.

The cases against all but defendants Joseph E. Casey, E. Stanley Klein and Julius Holmes have been disposed of. This concerns motions by defendants Casey and Klein to dismiss and by Casey to inspect the minutes of the grand jury. The grounds forwarded by each defendant in his motion to dismiss are similar except that Casey presents, as an additional ground, that he is immune from prosecution under the Fifth Amendment and Section 28 of the Shipping Act of 1916, 46 U.S.C.A. § 827. This claim of immunity will be considered first.

Immunity

Section 28 provides:

*United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States.* (Italics supplied.)

"Any such vessel, or any interest therein, chartered, sold, transferred, or mortgaged to a person not a citizen of the United States or placed under a foreign registry or flag, or operated, in violation of any provision of this section shall be forfeited to the United States, and whoever violates any provision of this section shall be guilty of a misdemeanor and subject to a fine of not more than $5,000, or to imprisonment for not more than five years, or both."

3. 46 U.S.C.A. § 839. Section 41 reads:

"That whenever by said section nine or thirty-seven the approval of the commission is required to render any act or transaction lawful, such approval may be accorded either absolutely or upon such conditions as the commission prescribes. Whenever the approval of the commission is accorded upon any condition a state-

ment of such condition shall be entered upon its records and incorporated in the same document or paper which notifies the applicant of such approval. A violation of such condition so incorporated shall constitute a misdemeanor and shall be punishable by fine and imprisonment in the same manner, and shall subject the vessel, stocks, bonds, or other subject matter of the application conditionally approved to forfeiture in the same manner, as though the Act conditionally approved had been done without the approval of the commission, but the offense shall be deemed to have been committed at the time of the violation of the condition.

"Whenever by this Act the approval of the commission is required to render any act or transaction lawful, whoever knowingly makes any false statement of a material fact to the commission, or to any member thereof, or to any officer, attorney, or agent thereof, for the purpose of securing such approval, shall be guilty of a misdemeanor and subject to a fine of not more than $5,000, or to imprisonment for not more than five years, or both."

"No person shall be excused, on the ground that it may tend to incriminate him or subject him to a penalty or forfeiture, from attending and testifying, or producing books, papers, documents, and other evidence, in obedience to the subpoena of the commission or of any court in any proceeding based upon or growing out of any alleged violation of this chapter; but no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing as to which, in obedience to a subpoena and under oath, he may so testify or produce evidence, except that no person shall be exempt from prosecution and punishment for perjury committed in so testifying."

Casey claims that he is entitled to immunity under Section 28 because he testified, under subpoena, before a grand jury in a proceeding "based upon or growing out of" alleged violations of the Shipping Act of 1916, and because his testimony was concerning the subject matter of the present indictment.

 Casey testified before a grand jury impanelled in the District of Columbia on September 2, 1952. That grand jury subsequently indicted Casey in Criminal No. 1647–53. However, at the time of his testimony, Casey was already named as a defendant in the present case under a sealed indictment. It is clear at the outset that Casey's rights, whatever they are, under Section 28 are not diminished by the fact that he was already under indictment at the time of his testimony. The language of the immunity provision is clear that a person shall not "be prosecuted" "for or on account of any transaction, matter, or thing" as to which he may testify. The

protection of immunity provisions is to prosecution and not to indictment. As is indicated hereafter, the immunity provision would be ineffective if it did not apply to indictments already returned and in which the witness was named as a defendant.

 The only purpose of immunity provisions is to compel evidence that is otherwise not obtainable because of the Fifth Amendment privilege against self-incrimination. The history of immunity provisions has been recently considered in United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 306 and Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264. Further discussion here is inappropriate.[4] It is sufficient to note that this history has simply been the process of making the immunity provisions effective by giving a witness the full protection to which he is legally entitled under the Fifth Amendment,[5] while at the same time providing safeguards against their misuse.[6] With this in mind we come to a consideration of Casey's claim of immunity.

Two questions are presented: (A) Is Section 28 applicable to the proceeding before which Casey testified? and (B) Is Casey entitled to its protection?

A. Is Section 28 Applicable to the Proceeding Before Which Casey Testified?

The language in Section 28 makes it applicable in "any proceeding based upon or growing out of any alleged violation of this chapter". The Government claims that the proceeding was not based upon nor did it grow out of alleged Shipping Act violations, but rather was limited to inquiry of possible violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1001 (false claims) which contain no immunity provision. In support of this the special assistant to the attorney general

4. See Dixon, The Fifth Amendment and Federal Immunity Statutes, 22 Geo.Wash. L.Rev. 447–480, 555–581 (1954); 8 Wigmore, Evidence, § 2281 (3rd ed., 1940).

5. E. g. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110;

United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409.

6. E. g. Brown v. Walker, 1896, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Heike v. United States, 1913, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450.

who was in charge of the proceeding has submitted his letter of authority for that special grand jury. The letter only makes reference to possible violations of 18 U.S.C. § 371 and § 1001. And in fact the indictment which that grand jury returned was brought under these sections only. The Government further argues that the subject matter of that inquiry was not related to Shipping Act violations, but concerned only possible false applications, balance sheets and financial statements submitted to the Commission in order to qualify for the purchase of vessels and that the procedure for the sale of the surplus vessels was covered only by the Merchant Ship Sales Act of 1946 which contains no immunity provision. Specifically, the Government claims that Casey was examined only as to these applications to purchase under the 1946 Act and was not questioned as to any matter based upon or arising out of Shipping Act violations.

The question is what comprises a "proceeding based upon or growing out of alleged violations of this chapter".

The test clearly cannot be that the indictment must be brought under the Shipping Act or whatever act contains an immunity provision. The result of a special grand jury investigation often indicates violations of different or additional laws than those on which the proceeding was initially "based". The words "growing out of" must be given their common sense meaning. The undesirable consequence of the test the Government suggests is easily seen. Assume that a witness' compelled testimony indicated possible violations of Act A, which has an immunity provision, and Act B, which does not. The Government then prosecutes the witness under Act B arguing that the proceeding, as seen by the indictment, was one neither based upon nor growing out of alleged violations of Act A. If the Government's argument were successful the immunity provision in Act A would be unconstitutional since its protection was not as broad as that which the witness was legally entitled to under the Fifth Amendment.[7] Consequently the witness could refuse to testify in spite of the immunity provision, and accordingly, a witness could refuse to testify whenever his testimony would indicate a possible violation of an act containing no immunity provision. Indeed such a result, by making immunity provisions unconstitutional, and therefore justifying a witness' refusal to testify, would thwart the possibilities of compelling testimony.

The requirements of the Fifth Amendment, as suggested above, and the phrasing of the immunity statutes "but no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing * * * he may so testify or produce evidence" seem to require that a witness is immune under any statute relevant to his testimony without regard to whether the statute contains an immunity provision. The cases also support the conclusion that the proper test for determining the nature of the proceeding for purposes of an immunity provision is the nature of its subject matter.[8]

In United States v. Goldman, D.C., 1928, 28 F.2d 424, two defendants were indicted for conspiracy to violate the National Prohibition Act, 27 U.S.C.A. § 1 et seq. after having testified before a grand jury investigating violations of that Act. The Act contained an immunity provision similar to Section 28. The court sustained a plea in bar noting that the language of the immunity provision, for or on account of any transaction, matter or thing as to which

7. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195.

8. United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503; United States v. Weinberg, 2 Cir., 1933, 65 F.2d 394, certiorari denied 290 U.S. 675, 54 S.Ct. 93, 78 L.Ed. 583; United States v. Goldman, D.C. Conn., 1928, 28 F.2d 424; Foot v. Buchanan, C.C.Miss., 1902, 113 F. 156 (by implication); Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, also supports the principle.

in obedience to a subpoena and under oath, he may so testify or produce evidence,

"Without doubt, shields the witness from any criminal prosecution involving the same subject-matter, regardless of the specific statute upon which the indictment is predicated. * * * Poor indeed, and derisively delusive, would be the protection afforded by section 30 of the National Prohibition Act, if its amnesty extended no further than to inhibit prosecutions formally based upon some section of the Act." 28 F.2d at page 433.

The holding of the Court seems clear that the test of the nature of a proceeding is determined by its subject matter and not the statute under which the indictment is returned.

A similar situation was presented in United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503. Andolschek appeared before a grand jury which subsequently indicted him for conspiracy to violate 26 U.S.C.A. Internal Revenue Code § 4047(e). An immunity provision in 26 U.S.C.A.Int.Rev.Code, § 3119 extended immunity to persons testifying in any suit or proceeding based upon or growing out of an alleged violation of 26 U.S.C.A.Int.Rev.Code, § 3100 and § 3124, not including § 4047(e). The indictment was dismissed as to Andolschek. Judge Learned Hand noted:

"The indictment was, it is true, for a conspiracy to violate § 4047 (e) of 26 U.S.C.A.Int.Rev.Code, and not any of those sections (§ 3100–3124) for which § 3119 grants immunity. Nevertheless, the events laid in the indictment as the substance of the conspiracy, were a crime under § 3115(a), as well as under § 4047(e)". 142 F.2d at pages 505–506.

The same principle is illustrated in United States v. Weinberg, 2 Cir., 1933, 65 F.2d 394, certiorari denied 1933, 290 U.S. 675, 54 S.Ct. 93. There the grand jury sought to question the defendant concerning violations of the National Prohibition Act. Defendant refused to answer certain questions on the ground that the immunity provision of the National Prohibition Act would not protect him against subsequent prosecution for violation of the Internal Revenue laws. The witness was prosecuted for contempt. At the trial the judge again posed the questions and Weinberg again refused. Weinberg was judged in contempt and the judgment was confirmed. The Court of Appeals said that though the trial judge could not guarantee the witness absolute assurance of immunity from prosecution under the tax laws, he properly stated that Weinberg could not be prosecuted for any crime as to which he had given evidence.

The question as to the necessary breadth of an immunity provision was precisely raised in the first case testing their constitutionality. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195. The Court held that the immunity provision was not an adequate substitute for the protection guaranteed by the Constitution, saying that in order to be valid, an immunity provision "must afford absolute immunity against future prosecution for the offense to which the question relates." 142 U.S. at page 586, 12 S.Ct. at page 206. Consequently, subsequent immunity statutes have been drawn in broader terms usually containing the language (as that in Section 28) that a person who testifies is protected from prosecution "for or on account of any transaction, matter, or thing as to which * * * he may so testify or produce evidence."

█ As suggested by Mr. Justice Holmes in Heike v. United States, 1913, 227 U.S. 131, 142, 33 S.Ct. 226, 228, an immunity provision "should be construed, so far as its words fairly allow the construction, as coterminous with what otherwise would have been the privilege of the person concerned." Indeed immunity provisions should be, and as the cases indicate, have been construed to effectuate their purpose.

Consequently the objective subject matter test must prevail.[9]

Next we consider the subject matter of the proceeding before which Casey testified. A knowledge of its background is helpful. As stated at the outset, this is one of a series of cases arising out of the disposition of surplus vessels after the Second World War. The cases arose out of what is editorially referred to as the "Shipping Investigation". The proceeding before which Casey testified also arose out of that investigation.

In disposing of the surplus vessels, the Commission sold some of the vessels to corporations whose citizenship status was under suspicion. It was believed that, though these corporations had an American president and American directors, and at least 51% of the stock was owned by persons who were citizens of the United States, aliens owned up to 49% of the stock, had made loans to the corporations, or had otherwise facilitated the requisite financing. In some instances it was believed that aliens had paid a higher price for their shares of stock than the price paid by American citizens. There was some question as to whether or not such corporations met the citizenship requirements of Section 2 of the Shipping Act of 1916.

In 1950, the Maritime Administration, a successor agency to the Maritime Commission,[10] appraised the policies as to the criteria used to determine whether a corporation qualified as a citizen under Section 2. An opinion was rendered by the general counsel for the Maritime Administration with particular reference to whether certain corporations qualified as citizens under Section 2. United States Petroleum Carriers, Inc., and Victory Carriers, Inc., whose indictments in Criminal No. 1647–53, United States v. Onassis, D.C., 125 F.Supp. 190 resulted from the proceeding before which Casey testified, and North American Shipping and Trading Company, Inc., a defendant in the present proceeding, were named. The question of how Section 2 should be interpreted was not resolved by the Maritime Administration.[11] Consideration of the Administration's interpretation of Section 2 is not, however, relevant here. It is sufficient to note for the purposes here that the status of corporations named as defendants in Criminal No. 1647–53 and the present case was then of concern.

9. There are additional problems which the use of the subject matter test avoids. If the nature of the proceeding would depend on a subjective test, such as some one's decision, whose decision would control—the grand jury's, the prosecutor's or the instigator of the proceedings? Also, unless the subject matter test prevails the following could occur: The witness claims the Fifth Amendment in the belief that the proceeding is not based on an act with an immunity provision. The Government indicts the witness under an Act with an immunity provision and cites the witness for contempt. On the other hand, the witness could testify fully in the belief that the proceeding was based on an alleged violation of an act with an immunity provision and then be indicted under an act providing no immunity provision and face the possibility of his testimony being used against him. As previously discussed, this result would render the immunity provision unconstitutional and therefore ineffective. It should be noted also that this whole area of problems is avoided in the many immunity statutes which require the witness to claim immunity before testifying. Under such provision the witness would be protected if the claim was not accepted for he could plead the Fifth Amendment as to self-incriminating testimony. And if the claim of immunity were accepted, the nature of the proceeding would be determined for purposes of the immunity provision. See dissenting opinion of Mr. Justice Frankfurter in United States v. Monia, 1943, 317 U.S. 424, 431, 63 S.Ct. 409; Dixon, The Fifth Amendment and Federal Immunity Statutes, 22 Geo.Wash. L.Rev. 447, 465 and note 84.

10. The United States Maritime Commission was abolished by the 1950 Reorganization Plan No. 21, eff. May 24, 1950, 46 U.S. C.A. § 1111 note, 64 Stat. 1273. The Maritime Administration was created by Section 201 of Reorganization Plan No. 21. The functions of the Maritime Administration are described in Sec. 307 of the Plan.

11. See H.R.Doc. No. 472, 82d Cong. 2d Sess. 51–52 (1952).

The Administration subsequently conducted a field investigation to determine whether certain corporations were controlled by aliens. It appears from a summary of its report that the investigation related to whether certain corporations were citizens within the meaning of Section 2.[12] The Report was transmitted to the Attorney General on January 15, 1951, for his consideration as to possible violations of the Shipping Act of 1916.[13]

Subsequently, the Senate Permanent Sub-committee conducted an inquiry into the sale of the surplus vessels. It held fourteen public meetings from February 18, 1952, to March 14, 1952, and issued its Interim Report on May 28, 1952.[14] This Report states that the inquiry, together with related matters, had been under investigation by the Maritime Administration since late in 1950, and that by June of 1951, the agency had prepared a series of investigative reports dealing with the activities of several companies. Among those named were American Overseas Tanker Corporation, North American Shipping and Trading Company, Inc., and United States Petroleum Carriers, Inc.,

The Report further states that on June 15, 1951, the Secretary of Commerce sent copies of the reports to the Attorney General with a request that the reports be studied with a view toward determining whether or not certain of the transactions involved civil fraud on the United States and whether or not certain criminal statutes of the United States had been violated. In this connection particular reference was made to the following provisions of the United States Code: 18 U.S.C. § 1001 and Sections 9, 37, 40 and 41 of the Shipping Act of 1916.[15]

The Report concluded with the following statement:

"The Department of Justice is also making an examination into the acquisition, chartering, and resale of tanker vessels by the American Overseas Tanker Corp., the China International Foundation, Inc., the North American Shipping & Trading Co., Inc., and the United States Petroleum Carriers, Inc., as well as the various affiliates and subsidiaries of these firms involving a total of 47 vessels. It is the purpose of that inquiry to determine whether civil as well as criminal action should be taken against these corporations and the responsible officials and representatives of these firms."[16]

These investigations have resulted in civil as well as criminal proceedings.

On the civil side, the Justice Department has seized and filed libels of information for forfeiture against a number of vessels owned by some of the corporations under investigation, including vessels owned by the United States Petroleum Carriers, Inc., and Victory Carriers, Inc.

In the main all the libels assert as their principal cause of forfeiture that the applicant corporations misrepresented their true citizenship status to the Maritime Commission when they represented that they were citizens within the meaning of Section 2 of the Shipping Act, whereas in fact they were controlled by aliens. The libels claim forfeiture under Section 9 of the Shipping Act because of the alleged misrepresentations made in the applications to the Maritime Commission, upon which the Commission acted favorably.

On the criminal side, the Attorney General has designated four special assistants who have returned a total of 13 indictments against an aggregate of 91 defendants.

From the foregoing it appears to the Court that in the most literal sense the proceeding before which Casey testified was one based upon or growing out of

12. Ibid. Appendix C, 95–101.

13. Ibid. at 53.

14. Sen.Rep. No. 1613, 82d Cong., 2d Sess.

15. Ibid. 34–35.

16. Ibid. 40.

alleged violations of the Shipping Act. The present case, specifically based on alleged Shipping Act violations, grew out of the same investigation which resulted in the proceeding before which Casey testified. Possible violations of the Shipping Act were mentioned at many stages of the investigation.

However, the more important test, in view of the purpose of the immunity provisions, is one of determining if the *subject matter* of the inquiry did *in fact* relate to Shipping Act violations. In an affidavit, the special assistant to the Attorney General, who was in charge of the proceeding, states that he was concerned only with possible violations of 18 U.S.C. § 1001. The investigation may have indicated violations of § 1001 more clearly than any Shipping Act provisions. However, I am satisfied that the subject matter of the inquiry was also closely related to possible violations of Sections 9, 40 and 41 of the Shipping Act.

The possible violations of Sections 9 and 41 can be considered together. As previously noted, Section 9 makes it a crime to transfer vessels to persons who are not American citizens, or to put such vessels under foreign registry or flag, without approval of the Commission. And Section 41 provides that whenever approval of the Commission is required by Section 9, it is a crime to make a false statement of a material fact in order to secure such approval.

The Government has taken the position here that Section 9 relates only to *sales* of vessels by *private* parties and not to misrepresentations in applications to *purchase* vessels from the Commission. However, as indicated above, the Government has consistently maintained in the libel actions that misrepresentation in an application to purchase vessels violated the provisions of Section 9. In these proceedings the Government has argued that Section 9 applies to a sale by the Commission to a private party, and that if misrepresentations were made in applications

for the purchase of vessels, then the transaction must be deemed to have been made without the approval of the Commission and consequently the vessel is subject to forfeiture provisions of Section 9. This argument finds support in Meacham Corporation v. United States, 4 Cir., 1953, 207 F.2d 537, 543, certiorari granted 1954, 347 U.S. 932, 74 S.Ct. 631. It is not necessary to consider the strength of the argument here. It is sufficient to conclude that the subject matter of the inquiry related to *possible* violations of Sections 9 and 41.

Also, the subject matter of inquiry appears to be closely related to possible violations of Section 40 of the Shipping Act, 46 U.S.C.A. § 838. Section 40 requires, among other things, that whenever certain documents are presented to the collector of customs to be recorded, the declarant shall file a statement setting forth facts relating to his citizenship status, and makes it a crime to make a false statement of a material fact in the statement. A bill of sale is one of the documents mentioned, and, as a matter of practice, the Commission gives a purchaser a bill of sale for each vessel at the time of the purchase, and the bill of sale is then taken to the collector of customs and the statement filled out. The statement, in the form prescribed by the Commission, requires the declarant to sign an affidavit that the purchaser of the vessel is a citizen of the United States. Certainly inquiry into alien control of purchasers and misrepresentations as to citizenship is quite as helpful for prosecution under Section 40 as it is for prosecution under § 1001.

■ I am satisfied that the Government has acted in good faith and that the indictment in Criminal No. 1647–53 was not brought outside of the Shipping Act in order to sustain its argument that the immunity provision is not applicable. However, for the reasons stated, it is clear that the intentions of the prosecutor cannot be the test for the applicability of an immunity provision. Under the subject matter test I am sat-

isfied that the immunity provision was applicable to the proceeding before which Casey testified.[17]

**B. Is Casey Entitled to Immunity?**

The question is whether Casey, in the course of his testimony, made such disclosures as entitled him to immunity from the present prosecution.

Since the purpose of the immunity statutes is to make evidence available that otherwise could not be obtained, it is clear that the disclosures must be self-incriminatory. In effect, the immunity is given in exchange for the self-incriminatory testimony. And, since the scope for an immunity provision should be no broader than the protection afforded by the Fifth Amendment, the qualification has been added that the immunity extends only to prosecution for crimes substantially connected with the evidence given, Heike v. United States, 1913, 227 U.S. 131, 33 S.Ct. 226.

In the Heike case, Heike had been called before a grand jury investigating alleged violations of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, in the sugar refining industry. The testimony did not earn him immunity, under the relevant immunity provision, on a subsequent indictment for a fraud on the revenue. The indictment charged a violation of the Internal Revenue Laws by the secret introduction of springs in scales to cause them to indicate less than the actual weight. Heike had given a table of annual meltings at the monopoly investigation. The indict-ment was sustained and the conviction upheld on the ground that there was no substantial connection between the fraud and the testimony submitted to the grand jury. Mr. Justice Holmes noted that, the evidence "did not tend to incriminate the witness. It neither led nor could have led to a discovery of his crime." 227 U.S. at page 143, 33 S.Ct. at page 228.

The rule laid down by the Heike case was stated in the following language:

"When the statute speaks of testimony concerning a matter it means concerning it in a substantial way, just as the constitutional protection is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law." 227 U.S. at page 144, 33 S.Ct. at page 228.

The Heike rule has been applied in a series of cases. On one side there are the cases where the court has not found a "substantial relationship" between the testimony given and the crime for which the defendant is indicted.[18] For example, in Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, certiorari denied 1949, 338 U.S. 860, 70 S.Ct. 103, a plea of immunity was denied on the ground that testimony before the grand jury regarding alleged violations of price regulations had no relation to the subsequent prosecution for violation of income tax laws. On the other hand, there are a group of cases where the "substantial relationship" has been found.[19] Two of these cases are particu-

17. This rather extensive discussion was required because of the rule that unless the statute requires it, the witness need not assert the immunity privilege at the time of his testimony. United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409; Adams v. State of Maryland, 1954, 347 U.S. 179, 74 S.Ct. 442. The statutory requirement is much preferable. For one thing, it makes it clear that immunity is given only for testimony that is incriminating and would not otherwise be volunteered. Also, it removes the necessity for determining the nature of the grand jury proceeding at this late date. When the privi-lege is asserted at the time of the testimony, the nature of the proceeding for purposes of the witness' immunity is determined by its acceptance or rejection. See 8 Wigmore, Evidence § 2282 (3d ed., 1940).

18. E. g., Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, certiorari denied 1949, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527; United States v. Greater New York Live Poultry Chamber of Commerce, D.C.N.Y.1929, 34 F.2d 967.

19. Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000; Edwards v. United

larly helpful in considering the problem here.

In Edwards v. United States, 1941, 312 U.S. 473, 61 S.Ct. 669, 85 L.Ed. 957, Edwards was indicted for conspiracy to violate and for violation of the Securities Act, 15 U.S.C.A. § 77a et seq., and mail fraud statutes in the sale of certain securities. Only the Securities Act contained an immunity provision. In a plea in bar, Edwards claimed that he was entitled to immunity under the relevant provision since he had testified concerning his identity and relationship to the organization whose securities the indictment charged him with fraudulently selling. The Supreme Court ruled that the plea was good on its face, saying that, "Petitioner's identity and his relationship to the trusts alleged to have been created by him as a part of the fraudulent scheme are of primary importance in the proof of his criminality." 312 U.S. at page 479, 61 S.Ct. at page 673. The Heike case was distinguished since the testimony there "'neither led nor could have led to a discovery of his crime.'" 312 U.S. at page 480, 61 S.Ct. at page 673. Casey claims that he made disclosures as to his "identity and relationship" to certain relevant corporations.

In Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, the defendant gave testimony concerning matters falling within the jurisdiction of the Office of Price Administration, relying on an immunity provision in the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq. He was indicted for violations of the Second War Powers Act, 50 U.S.C.A.Appendix, § 633, and for conspiracy to violate the Emergency Price Control Act of 1942. The charges involved misuse of priorities for materials and conspiracy to sell goods at above-ceiling prices. An immunity plea was sustained. The Court said, "Certainly many of these disclosures furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment. Petitioner testified concerning transactions, matters and things substantially connected with part of the conspiracy for which he was indicted—for example, the testimony that he bought material under invoice from a named supplier and paid for it by check on a named bank. This evidence being substantially connected with the conspiracy was ample to give immunity from the conspiracy prosecution." 337 U.S. at page 153, 69 S.Ct. at page 1008. Casey claims that he made disclosures which furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment.

It is clear, of course, that in order for immunity to obtain, the facts brought out must not be disassociated with the prosecution as in the Heike case. Rather they must be pertinent to the present prosecution and substantially connected with the alleged offense. The rule is much easier to understand than to use fairly.

With the rule in mind, we will now consider the nature of Casey's testimony.

In an affidavit in support of his motion, Casey has sworn that he testified as to transactions, matters and things which are pertinent to the present prosecution and which are substantially connected with the alleged offense. The affidavit is based on factual allegations rather than hunches, surmises or beliefs. These allegations, if true, would support the claim for immunity and for inspection of the grand jury minutes.

Regarding the motion for inspection of the grand jury minutes the policy of the law, as set forth in Rule 6(e), Federal Rules of Criminal Procedure, 18 U.S.C., is clear. It dictates that grand

States, 1941, 312 U.S. 473, 61 S.Ct. 669; United States v. Greater Kansas City Retail Coal Merchant's Ass'n, D.C.W.D.Mo., 1949, 85 F.Supp. 503; Lumber Products Ass'n v. United States, 9 Cir., 1944, 144 F.2d 546, 553, reversed on different grounds; United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973.

jury proceedings shall 'be secret.' Certainly most defense counsels' requests for the production of grand jury minutes are denied.' Easy granting of such requests would dangerously impair our system of grand jury procedure since it would open the way for an exploratory expedition into the Government's evidence, as well as encourage dilatory tactics. In light of this, the Court believed that the administration of justice would be best served if the grand jury minutes were submitted to the Court rather than to Casey. The Government has consented to this and I have carefully examined the testimony which Casey gave before the grand jury.

The grand jury minutes were read with three considerations in mind: First, that positive answers were given and not merely a denial of knowledge of facts. Second, that the disclosure was of facts asked for, not of facts volunteered or irrelevantly interjected. And, Third, that the facts concern a matter as to which the answer might, with reasonable possibility, be incriminating on the offenses charged here. 8 Wigmore, Evidence, § 2282 at 505 (3d ed., 1940).

Casey testified that he formed AOTC and was a stockholder and the prime mover in the company. He stated that he knew there was a policy against selling to foreigners, but that he thought the Commission veered toward selling vessels to Americans for foreign ownership and registration. He indicated that having found out this policy he made application for Panamanian ownership and registry, and the application was accepted for American ownership and Panamanian registry. He stated how his success prompted his brother-in-law to form a company to do the same thing. This company was the United States Petroleum Carriers, Inc. He testified as to how he wanted Admiral Bowen, with whom he had previous relations, to be president of the corporation, and as to the basis for stock distribution in the corporation. He testified fully as to how he had helped present the application of United States Petroleum Carriers to the Commission, and his relations with members of the Commission. He testified fully as to what he knew of the alien control of United States Petroleum Carriers and Victory Carriers, its wholly owned subsidiary, as well as his knowledge as to how the vessels were financed.

The Court is satisfied that Casey's testimony was pertinent to the present prosecution and substantially related to the offenses charged here, and that it satisfies the three considerations with which it was read. His testimony as to his identity and relationship to AOTC was incriminating. As suggested by Edwards v. United States, supra, 312 U.S. at page 479, 61 S.Ct. at page 673, such facts are of "primary importance in the proof of his criminality." I believe that his testimony as to his relationship with the Commission, his knowledge of its policies, and his part in the organization of United States Petroleum Carriers, as well as his knowledge of the control and financing of the corporation was likewise incriminating. The theory of the Government in United States v. Onassis, Crim. No. 1647–53 is quite similar to its theory here. The essential complaint in each case is that vessels have passed into alien control through sale of stock. Casey's activities and knowledge concerning United States Petroleum Carriers may well be admissible to show absence of mistake and plan. The history of the "Shipping Investigation" clearly reflects that the alleged violators and the alleged offenses had much in common. As suggested in Smith v. United States, supra, 337 U.S. at page 153, 69 S.Ct. at page 1008, "Certainly many of these disclosures furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment."[20]

---

20. It should be added that the Government may have been obliged to inform Casey that he was under indictment in the present case before calling him as a

██ Where the statute does not require a specific claim of immunity at the time of the testimony, the risk that an immunity provision will be successfully invoked at a later stage is one that must be fairly borne by the Government. The policy of immunity statutes to get evidence which is otherwise unavailable is simple to understand. Where the statute does not require the claim of privilege, the Government must decide whether the testimony is worth the possible immunity. Where the statute requires the specific claim of privilege, it must decide whether the testimony is worth the immunity. Of course, the immunity provisions should not be construed to provide broader immunity than is necessary. Yet the courts have an obligation to make them effective by assuring that the protection afforded is equal to that which the witness is legally entitled under the constitutional provision, without providing a "gratuity to crime". Heike v. United States, 1913, 227 U.S. 131, 142, 33 S.Ct. 226. The Court is convinced that the dismissal of the indictment against Casey is consistent with this obligation.

Counts Four and Five.

Defendants attack the sufficiency of counts Four and Five. The counts charge an offense under Section 9, alleging that the defendants made an agreement to transfer vessels to persons not citizens of the United States, without approval of the Commission, by means of the sale of all the stock in AOTC. The counts differ only in the name of the alleged transferee.

Defendants urge that the counts are deficient because Section 9 applies only to the transfer of vessels or any interest in a vessel, and contains no restriction on the transfer of stock. I find defendants' contention persuasive for the following reasons:

██ The language of Section 9, on its face, applies only to specific dealings in "any vessel or any interest therein". The transfer of stock is not, on its face, a transfer of any interest in a vessel. The settled rule is that a corporation's property interests and a stockholder's stock interests are distinct. Title to corporate property is held in the name of the corporation and not by its stockholders. Likewise, a stockholder's holdings are in the corporation and not specifically in any of its assets. Accordingly, the transfers by one do not pass as the act of the other. We may not assume that Congress intended to give the words "any vessel or any interest therein" an unusual meaning.

██ The Government relies on the phrase, "to sell, mortgage, lease, charter, deliver, or in any manner transfer" and argues that the words, "in any manner transfer", include the sale of stock, particularly a sale of all the stock. It should be noted though that the phrase, "or in any manner transfer", appears in a class of transactions including sell, mortgage, lease, charter and deliver. These terms cover transactions dealing directly with the vessel. It is most reasonable to construe the catch-all phrase as covering only other possible transactions dealing directly with the vessel which would result in its transfer. The ejusdem generis rule is a good guide to statutory construction. A catch-all phrase should not be construed to open

witness in front of the grand jury which returned the indictment against him in United States v. Onassis, Crim. No. 1647–53. As already suggested, this case is closely related to that one. One has cause to refuse to testify whenever he has reasonable basis to believe that his testimony would tend to incriminate himself. The fact that Casey was under indictment in closely related issues provided at least some basis for such belief. The policy of secrecy surrounding sealed indictments, though important, should not diminish one's constitutional rights. Certainly Casey was something other than an "ordinary witness" at the time of his testimony. See United States v. Lawn, D.C.N.Y., 1953, 115 F.Supp. 674, 677; United States v. Miller, D.C.Pa., 1948, 80 F.Supp. 979, 981, appeal dismissed sub nom. United States v. Roth, 2 Cir., 1954, 208 F.2d 467; 8 Wigmore, Evidence § 2268 (3d ed., 1940).

up a whole new area of transactions. Additional ground for the conclusion that Section 9 is not applicable to the sale of stock appears in the legislative history and in Section 37 of the Shipping Act of 1916, as amended.

In the original 1916 Act, Section 9 applied only when a vessel was "sold" (peace time) or was "sold, leased, or chartered" (war time) to any person not a citizen of the United States, 39 Stat. 730. Accordingly, it is clear that at the outset the Shipping Act did not cover the transfer of stock.

In 1918, in view of the exigencies of the war, Congress created Section 37, 46 U.S.C.A. § 835, which contains more severe restrictions and whose application is limited to war time. The possibility that Section 9 could be avoided by the transfer of stock was recognized at this time. Section 37(b) contains the same restriction which appears now in Section 9, and in like language applies to the sale, mortgage, lease, charter, delivery or the transfer in any manner of a vessel or an interest therein. However, Section 37(d) was inserted to specifically cover the transfer of stock, and it applies when "the controlling interest or a majority of the voting power" is vested in or for the benefit of any person "not a citizen of the United States".

Certainly if stock of a vessel owning corporation were an interest in the vessel owned, there would have been no reason for Section 37(d). It seems clear from the existence of Section 37(d) that Congress did not regard Section 9 as applying to the transfer of stock. The conclusion is reasonable that the relationship between Section 37(d) and Section 9 indicates that the transfer of a controlling interest in a corporation was restricted in time of war or national emergency, but was not restricted in time of peace. This conclusion is supported by the testimony of the draftsman of the 1918 amendments during proceedings before the House Committee on Merchant Marine and Fisheries. Hearings on H.R. 11361 and H.R. 11362, 65th Cong., 2d Sess. (1918):

"Mr. Burling * * * You see the original act prohibited a ship from being transferred to a corporation which is owned abroad, but there is nothing in the act to prevent foreigners from coming in and buying all the stock. You can organize a corporation the stock of which is owned by Americans, and as soon as it is organized you can go to work and have that stock transferred to foreigners and thereby defeat the spirit of the law, and this (Section 37) forbids that any such stock shall be so transferred", at 42

\* \* \* \* \* \*

"Mr. Hardy. Section 38 and the prohibitions and penalties there applies not only to selling ships but to selling stocks and other forbidden acts that are embraced that were not in the original shipping act.

"Mr. Burling. Yes, sir," at 46

\* \* \* \* \* \*

"Mr. Burroughs. There are certain provisions in there, as you have drafted it, as I understand, that you want to continue after the war; that is, to be permanent amendments to the shipping act?

"Mr. Burling. Yes. The original act has a lot of provisions that are not limited to the war; but I am not sure—

"Mr. Burroughs (interposing). That is, these provisions in regard to the transfer of stock?

"Mr. Burling. Those are limited to the war." at 58.

The Government argues, however, that Section 9 has been expanded since the 1918 amendments and that the new Section 9 covers transfers not covered at the time Section 37 was passed. Section 9 was amended in 1938. At that time the language, "or in any manner transfer" and "or any interest therein" was added. The Government argues that this expansion, considered in light of the policy of maintaining an American-owned merchant marine for national securi-

ty and development and maintenance of commerce, indicates an intention by Congress to cover transfers of control over vessels through sale of stock. However, as previously noted, precisely the same phrasing is contained in Section 37 (b) although Section 37(d) specifically covers the sale of stock. If a transfer "in any manner" or of "any interest therein" does not cover the sale of stock for purposes of Section 37, no reason appears to presume that it covers such a transaction for Section 9. If there is a purpose to its existence it must be that Section 37(d) covers situations not covered by Section 9.

▮▮▮▮ Moreover, there may well be a significant public policy distinction between the sale of stock and the sale of a vessel. The regulation of stock sales presents difficult problems of practical administration. Regulation of stock sales may necessarily have an adverse effect on our marine commerce. Congress may have believed that this adverse affect was justified only by the necessities of war or national emergency. It has frequently been stated that a free market in stock transfers is essential to the flow of risk capital into American enterprise. On the other hand, the policy of maintaining an American merchant marine is easily appreciated. The Government has shown convincingly that this was an underlying motive in the Merchant Ship Sales Act of 1946 and the Shipping Act of 1916. It is also quite apparent that a transfer of *all* of the stock violates the spirit of the law. However, the good faith of the defendant is not an efficient test for criminal violation. If there is an undesirable loophole in Section 9 it will probably be remedied.

Counts One to Three and Six to Eight

Defendants urge the dismissal of counts one to three and six to eight on the basis that the contractual provision which provides the predicate for these counts is inapplicable to stock transfers. The counts charge a conspiracy to violate and a violation of the condition attached to approval of the transfer to

foreign registry and flag by the transfer of the stock in AOTC. The argument urged by defendants is similar in effect to that urged with respect to whether Section 9 applies to stock transfers.

▮▮▮ The condition attached to the sale of each vessel explicitly recites that the American citizenship ownership and Panamanian registry of the vessel shall not be changed without prior approval of the Commission. Under Section 41, the Commission has full discretion on the type and extent of condition it attaches to its approval as required by Section 9. It is undisputed that the condition attached was a reasonable use of the Commission's discretion. It is undisputed also that a sale of stock can cause a change in American citizen ownership as defined in Section 2. Since the American citizenship ownership can be changed by the sale of stock, it is clear that the condition could be violated by the sale of stock.

This result is not inconsistent with the conclusion reached as to the applicability of Section 9 to stock transfers. The difficulty there was the specific limitation of Section 9 to the transfers of vessels or interests therein. Such a limitation does not exist in the condition incorporated in the contract. By its terms the condition is violated whenever the effect of the transfer is to change American citizen ownership. Thus, though a transfer of stock may not be violative of Section 9, it may nevertheless be violative of the condition. Of course, the Government still has the burden of proving that American citizenship ownership was in part changed.

Defendants urge dismissal of the counts on an additional ground. They argue that the counts are deficient in that they fail to allege that the condition was entered upon the records of the Commission and incorporated in the first document or paper which notified AOTC that its application had been approved.

The relevant provision in Section 41 provides that, "Whenever the approval of the [board] commission is accorded upon any condition a statement of such condi-

tion shall be entered upon its records and incorporated in the same document or paper which notifies the applicant of such approval." It is true that the counts do not precisely allege that the condition was entered upon its records or incorporated into the first document notifying AOTC of approval.

Defendants argue that, in fact, the condition was not incorporated in the first document notifying AOTC of approval. They point to a telegram on October 3, 1947 notifying AOTC that its application to purchase five vessels had been approved, and to a letter on December 12, 1947, which gave the names of the vessels allocated pursuant to the approval. The telegram and letter were both prior in time to the contract of December 19, 1947, where the condition was incorporated.[21]

However, the application for purchase contained no request of approval for transfer to Panamanian registry and flag. The application merely stated that if it was approved, the applicant intended to apply, pursuant to Section 9 or 37 of the Act, for approval to transfer or place the vessels under Panamanian registry or flag. The requirements of Section 41 apply only where the act or transaction required approval under Section 9. An application to purchase vessels, which does not request approval of transfer to foreign registry or flag, does not require Section 9 approval.

Until AOTC applied for approval of transfer to Panamanian flag and registry the provisions of Section 41 were not applicable. Section 41 merely contemplated that the condition be incorporated in the first document notifying the applicant of *approval of transfer to foreign registry and flag.*

In fact, there is no record of a formal application by AOTC for approval of a transfer to foreign registry and flag. The Commission must have understood

defendant's interest in acquiring such approval from the negotiations. Regardless, the formal contract was the first document notifying defendants of the Commission's approval of the transfer, and the condition was included therein.

The condition was also entered upon the records of the Commission as required by Section 41. A separate record was prepared for each vessel purchased. The condition was included on the record and a copy was sent to defendant purchaser.

The Court is satisfied also that these counts meet the requirements of definiteness contained in Rule 7(c) of the Federal Rules of Criminal Procedure. The indictment traces the entire transaction (1) the contract for purchase; (2) approval of the transfer to foreign registry and flag, pursuant to Section 9; (3) the condition incorporated pursuant to Section 41; (4) the taking of title; and (6) the violation of the condition by changing American citizen ownership without prior approval from the Commission.

Counts one to three and six to eight are specific in their allegation of conspiracy to violate and violation of the condition. Defendants have been frank in not claiming that they were uncertain as to the offense charged. Defendants were fully apprised of the nature of the offense charged and the indictment furnishes adequate basis to plead former jeopardy. An indictment need not be perfect to be sufficient.

Defendants' motion to dismiss counts one to three and six to eight will be denied.

Statute of Limitations

As an additional ground for dismissal, defendants urge that counts four to eight be dismissed on the ground that the indictment was not "found" within three years after the alleged offenses were committed. Defendants' reasoning is

21. The rule that the condition be incorporated in the first document notifying the applicant of approval is not a mere technicality. On notification of approval of

the application to purchase, the purchaser is entitled to make commitments without fear that they will be subject to conditions subsequently imposed.

that (1) the offenses in these counts were alleged to have been committed on June 26 and July 25, 1950; (2) the indictment was filed in open court and sealed on April 23, 1953, less than three years after the commission of the alleged offenses; (3) the seal was not broken until February 23, 1954, more than three years after the commission of the alleged offenses; (4) therefore, the indictment was not found until February 23, 1954.

The applicable statute is 18 U.S.C. § 3282. It reads:

> "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within three years next after such offense shall have been committed."

The question is whether an indictment has been "found" when it is filed in open court, even though it remains sealed.

The case of United States v. Michael, 3 Cir., 1949, 180 F.2d 55 certiorari denied 1950, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383, is precisely in point. There the appellant argued that since the sealed indictment was not opened within three years after the alleged offense was committed it was not "found" within the three-year statute of limitations. To this point the court said:

> "We do not agree. The finding of an indictment is the function of the grand jury. * * * When the grand jury has found an indictment to be a true bill it has completed its action thereon by returning the indictment, duly endorsed as a true bill by its foreman, to the district court in open session, its function has been fulfilled. The indictment has been 'found' within the meaning of the statute of limitations regardless of what the district court may thereafter do or fail to do with respect thereto." 180 F.2d at page 56.

Defendants argue that the result of United States v. Michael, supra, works an injustice. They argue that under the rul-

ing in the case the Government could keep an indictment under seal for many years and then commence its prosecution when the witnesses and proofs necessary for the defense have become unavailable. Certainly the purpose of the statute of limitations is to avoid such experience. However, the Michael case should not be interpreted too broadly. The court specifically found that the appellant was not prejudiced by the delay of fifty-four days in making the indictment public.

Criminal Procedure Rule 6(e) authorizes indictments to be kept secret until the defendant is in custody or has given bail. The rule is important to criminal administration. It certainly encompasses a situation where the defendant cannot be found within three years after the alleged commission of the offense. If the situation was not covered, the result would only encourage fugitives from justice. Of course an extensive delay could prejudice the defense and thereby invade the purpose of the statute of limitations. The defendants who are available in an indictment naming several defendants should not have their rights endangered by the absent defendant. This is simply another circumstance in which the rights of the individual must be weighed against those of the state. The rights of the individual have not been infringed, however, unless he can show prejudice as a result of the delay. The defendants have not claimed that they have been prejudiced by the delay and on the basis of the record the Court is satisfied that they were not prejudiced as a result of the indictment remaining sealed.

The remaining contentions advanced by defendants have been seriously considered, but they do not necessitate discussion.

For the reasons herein expressed, the indictment against Joseph E. Casey will be dismissed, counts four and five will be stricken, and reference to violation of Section 9 will be stricken from the remaining counts. An appropriate order will be entered.