# SMITH v. UNITED STATES.

No. 292.   Argued March 4, 7, 1949.—Decided May 31, 1949.

*Walter R. Hart* argued the cause for petitioner. With him on the brief was *Julian C. Tepper*.

*Harold D. Cohen* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Campbell* and *Robert S. Erdahl*.

MR. JUSTICE REED delivered the opinion of the Court.

Petitioner, George Smith, together with Daisart Sportswear, Inc., and another person, was charged by the United States in two informations of forty-one counts each with violations of § 301 of the Second War Powers Act[1] and Priorities Regulations Nos. 1 and 3.[2] The first information charged petitioner and his co-defendants with the intentional misuse of priority ratings in forty-one instances in order to purchase certain cotton and rayon materials and the second information charged them with the unlawful utilization of the textiles so obtained. The same defendants were also indicted in the same court for conspiring to violate the Emergency Price Control Act of 1942[3] and the regulations thereunder by selling finished piece goods above the established maximum price and by keeping false records of their transactions. The two informations and the indictment were consolidated for trial in the District Court of the United States for the Southern District of New York; after trial before a jury petitioner was found guilty on the indictment and on thirty-five counts of each of the informations. On appeal the Court of Appeals for the Second Circuit affirmed the conviction as to the indictment and twenty-

[1] 56 Stat. 176, 177; 58 Stat. 827; 60 Stat. 868.

[2] 32 C. F. R., Cum. Supp. §§ 944.1–944.21; 32 C. F. R., Cum. Supp. § 944.23.

[3] 56 Stat. 23 *et seq.*, as amended, 56 Stat. 767, 58 Stat. 632, 59 Stat. 306, 60 Stat. 664.

three counts of each of the informations, but reversed as to twelve counts of each of the two informations. *United States* v. *Daisart Sportswear,* 169 F. 2d 856.

During 1944 and 1945 the petitioner, Smith, was the sole owner and officer of Daisart Sportswear, Inc. (hereinafter called Daisart), a corporation engaged in the fabrication, purchase, and sale of textile goods. Its actual operation was as a contractor working on the goods of others. As part of its business Daisart was to furnish Metals Disintegrating Corporation with cloth bags for filtering and packing the metal powders manufactured by Metals Disintegrating under contracts with the Army and Navy. The War Production Board had granted Metals Disintegrating high preference ratings to secure the materials necessary to fulfill its government contracts. Because of its inability to provide the particular cloth used to make powder bags, which was of a greyish white duck color, very similar to the canvas used in tents, Metals Disintegrating gave Daisart high blanket preference ratings which Daisart was to apply or extend [4] to purchase all the piece goods needed to manufacture the bags.

There is evidence which would justify a jury in finding the following facts. Through the use of these top priorities petitioner obtained piece goods for his company, and in the orders he certified that the goods were to be manufactured into powder bags. Over two and a half million square yards of material were thus invoiced to and paid for by Daisart. Metals Disintegrating, however, purchased from Daisart only 11,987 powder bags, consisting of 48,920 square yards of material. Moreover these piece

---

[4] A footnote to the opinion of the Court of Appeals, 169 F. 2d 856 at 859, states: "These terms are explained in United States v. Bradford, 2 Cir., 160 F. 2d 729, certiorari denied 331 U. S. 829, 67 S. Ct. 1351. A preference rating is *applied* by the original recipient to obtain commodities from a supplier who then *extends* (uses) the rating to secure the needed commodities from subsuppliers."

goods which petitioner obtained by means of preference ratings consisted of fabrics of a wide variety of colors and finishes. They were resold by Daisart, often still in their original packing, to manufacturers of civilian clothing at prices far in excess of the maximum established by law. In these transactions petitioner and his corporation in conspiracy with the other person indicted used fictitious names, gave false descriptions of goods and prices, and falsified invoices, but the money paid for the goods arrived by circuitous and devious routes into the bank accounts of either petitioner or Daisart Sportswear, Inc.

Such evidence is amply sufficient to sustain petitioner's conviction on the informations and indictment, but he insists that he is immune from prosecution for the acts of which he stands convicted. He bases his claim to immunity on § 202 of the Emergency Price Control Act of 1942, as amended; 56 Stat. 23, 58 Stat. 632, which reads as follows:

"(a) The Administrator is authorized to make such studies and investigations, to conduct such hearings, and to obtain such information as he deems necessary or proper to assist him in prescribing any regulation or order under this Act, or in the administration and enforcement of this Act and regulations, orders and price schedules thereunder.

"(c) For the purpose of obtaining any information under subsection (a), the Administrator may by subpena require any other person to appear and testify or to appear and produce documents, or both, at any designated place.

"(g) No person shall be excused from complying with any requirements under this section because of

his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U. S. C., 1934 edition, title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege."

The Compulsory Testimony Act of February 11, 1893, 27 Stat. 443, 49 U. S. C. § 46, provides:

"That no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpoena of the Commission, . . . on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission, or in obedience to its subpoena, . . . *Provided,* That no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying."

Petitioner's plea of immunity arose out of his testifying before an examiner of the Office of Price Administration in response to subpoenas issued by that office. In August, 1945, investigators of the War Production Board began an inquiry into the transactions of Daisart Sportswear, Inc. Two subpoenas were issued by the Office of Price Administration summoning petitioner individually and as an officer of Daisart to appear before an official of the Office of Price Administration. The subpoenas directed petitioner to produce all records and documents "pertaining to the purchase, sale, manufacture, fabrication and/or finishing piece goods, materials, fabrics from January 1,

1945, up to the present time." On April 30, 1946, pursuant to the subpoenas, petitioner appeared with counsel before an examiner of the O. P. A. After a ruling, unchallenged by respondent, that the appearance was under the compulsion of a valid subpoena, petitioner was sworn in as a witness and advised erroneously that he could not be compelled to make any self-incriminating statements and further advised that he had certain constitutional guarantees. This was an obvious reference to the Fifth Amendment's protection against self-incrimination as recognized by § 202 of the Emergency Price Control Act of 1942, quoted above.

After a few questions of a preliminary nature, petitioner stated: "I want to claim privilege as to anything that I say." Thereafter, in answer to questions by the examiner, petitioner explained that the records required by the subpoenas had either been destroyed, lost, or misplaced. He testified that he was the sole owner and officer of Daisart Sportswear, Inc., which until it went out of business in October, 1945, was engaged in the manufacture, purchase, and sale of textiles and allied products. In carrying on this business, the material out of which products were made was often furnished to Daisart by the organization, a so-called manufacturer, for whom Daisart contracted to make the product. Smith then testified that from various operations Daisart sold surplus fabrics and textiles; that for Metals Disintegrating Company, Daisart made bags and that for certain manufacturing operations Daisart had to acquire materials and fabrics. He denied that Daisart bought any material for the sole purpose of reselling it and stated that Daisart sold only material which was surplusage from its various operations. As examples of his company's operations, petitioner said that Daisart was a contractor for five companies which he specifically named and for many others whose names had slipped his mind; and that

Daisart also manufactured ammunition bags as a sub-contractor for Metals Disintegrating Company, which had a prime contract with the Government. In reply to the question as to how Daisart arrived at its selling price with respect to the material it sold, petitioner answered: "Since it was surplus, it was sold at the price billed to me plus freight and haulage and less discount allowed to me."

Petitioner gave the names of "A. Steinman & Co.," "L. Lazarus & Co.," and "Southeastern Cottons" as three of the firms from whom Daisart purchased materials and fabrics, stated that Daisart received invoices from the suppliers for its purchases, and that Daisart paid for its purchases by check at all times. He disclosed the Fidelity Union Trust Company of Newark, N. J., as the bank where Daisart maintained its account, and gave the name of the accountant who had the social security and bank statements of Daisart. He testified that these records would reflect the total overall business of Daisart, including the purchase and sale of all materials. According to petitioner, Daisart usually received the material from the manufacturer with whom it was contracting, and Daisart merely supplied labor and trimming. The manufacturer did not bill Daisart for the material, but simply shipped it for use by Daisart, who in turn billed the manufacturer for the finished garments. It was tacitly understood that if Daisart could save any of the material, it could do as it pleased with that excess material. Petitioner said that the waste from the making of ammunition bags approximated the amount actually used in the bags, and that Metals Disintegrating knew this fact but never made any claim with respect to the waste.

After the foregoing evidence, there occurred the following colloquy between petitioner and the examiner:

"Question [by O. P. A. examiner]: So that with respect to Daisart Sportswear Inc., contracting ac-

tivities on ammunition bag materials, were shipped by the manufacturer' without bill?

"Answer [by petitioner] : It was not. Metals Disintegrating Company being a foreign concern and being unable to furnish this material, they asked me to purchase materials for them. They were aware that I cannot do that without proper priorities. Those priorities were forthcoming in a blanket sum. No stipulated amount and I was further told to maintain a constant stock for any orders they may call. I mean Daisart Sportswear Inc., for any orders they may call for. Their orders came to me sometimes dated and never in any set size or specified form. They charged from day to day. I then went about purchasing material for their work. When and if I had a surplus, I would notify them and ask them if they had anything immediately on hand as I am overstocked, at which time they told me they had not and to dispose of it.

"Question: This is a voluntary statement. You do not claim immunity with respect to that statement?

"Answer: No.

"Question: I assume that anything you tell us, Mr. Smith, is subject to verification? You state that after a time Metals Disintegrating Company, although it had a contract with the government, was not in a position to furnish you with the materials necessary for Daisart to manufacture this item?

"Answer: Right.

"Question: And that because of that situation, Daisart was required to obtain priorities so that Daisart could obtain the materials and that it did so?

"Answer: In a blanket amount.

"Question: And that pursuant to that priority, Daisart thereafter acquired materials, some of which

were used in the manufacture of ammunition bags for Metals, and some of it was disposed of by Daisart, is that correct?

"Answer: Yes.

"Question: And those disposals by Daisart formed a good part of the sales of fabrics made by Daisart?

"Answer: They did."

When the prosecution during the trial sought to introduce the transcript of this testimony before the O. P. A. official, petitioner moved for a dismissal of the informations and the indictment against him upon the ground that he was granted immunity from prosecution by the Price Control Act of 1942 for the acts concerning which he was questioned. Petitioner asserted that the hearing before the O. P. A. official covered essentially the same matters which formed the basis for the informations and the indictment. The trial judge reserved decision on the motion and received the transcript of the testimony in evidence against petitioner and the corporation. Subsequently the court ruled that the transcript was not admissible against petitioner, but was only admissible against the defendant corporation, and the jury was so instructed. The trial court also overruled the motion for a dismissal of the charges against petitioner and stated that "the testimony does not prove any part or feature of the commission of a crime, nor will it tend to a conviction when combined with proof of other circumstances which others may supply." This the trial court thought was the test. Conviction followed on 35 counts of each of the two informations and on the indictment for conspiracy. Petitioner was sentenced to pay $10,000 on each count, a total of $710,000 in fines and to imprisonment in such a way that he would have three years to serve.

The Court of Appeals reversed the conviction of petitioner on twelve counts of each of the two informations

on the ground that because he had "not waived immunity in respect to his earlier disclosure that A. Steinam & Co., L. Lazarus & Co., and Southeastern Cottons were sellers to the corporation, he cannot be prosecuted on the counts based on transactions with those companies." 169 F. 2d at 861. These were the three companies specifically named by petitioner in his testimony before the examiner of the Office of Price Administration. This reversal reduced the amount of the fines imposed upon petitioner by $240,000, but not his sentence of three years' imprisonment. The Court of Appeals affirmed the rest of the sentences on the informations and the indictment. It held that petitioner's claim to immunity by reason of his testimony before the examiner was clear and good but for the statement made by petitioner set out above. This the court thought was voluntary and waived all immunity on the facts therein stated and that these were the essential facts in the convictions. 169 F. 2d at 860, 862. One judge dissented in part on the ground that by his testimony before the O. P. A. official petitioner had acquired immunity from prosecution for the transactions charged in the indictment. Because of the importance of the problem in the administration of federal criminal justice, we brought the case here by certiorari. 335 U. S. 882.

*First.* The evolution of congressional policy in dealing with immunity from criminal prosecution in return for evidence has been adequately discussed recently by this Court · *United States* v. *Monia,* 317 U. S. 424 (1943), and *Shapiro* v. *United States,* 335 U. S. 1 (1948). Through *Counselman* v. *Hitchcock,* 142 U. S. 547, it was established that absolute immunity from federal criminal prosecution for offenses disclosed by the evidence must be given a person compelled to testify after claim of privilege against self-incrimination. To meet that requirement Congress amended the immunity provisions of the Interstate Commerce Act, 24 Stat. 383, § 12, that protected a wit-

ness from use against him of evidence so given in any subsequent criminal proceeding so as to provide that the witness should not be "prosecuted . . . . for or on account of any transaction, matter or thing, concerning which he may testify . . . ." P. 141, *supra*. This remission of responsibility for criminal acts met the "absolute" test of the constitutional provision against self-incrimination. *Brown* v. *Walker,* 161 U. S. 591. If a witness could not be prosecuted on facts concerning which he testified, the witness could not fairly say he had been compelled in a criminal case to be a witness against himself. He might suffer disgrace and humiliation but such unfortunate results to him are outside of constitutional protection. *Id.,* p. 598. Cf. pp. 630–631. This compulsory testimony statute was further amended in 1906 to provide that the immunity should extend only to a natural person testifying under oath in obedience to a subpoena. 34 Stat. 798. The *Monia* case, *supra,* decided in 1943 that it was not necessary for a witness to claim his privilege against self-incrimination under the compulsory testimony statute as thus amended. This conclusion was reached on an interpretation of the immunity statute, p. 430, despite a contrary rule requiring a claim of privilege under the self-incrimination provision of the Fifth Amendment. See *Vajtauer* v. *Commissioner,* 273 U. S. 103, 113. Cf. *Heike* v. *United States,* 227 U. S. 131.

In the light of these decisions adjusting a witness' duty of testimony to his constitutional protection against self-incrimination, Congress has been enabled, through the use of the Compulsory Testimony Act of 1893 as a model, to legislate so as to force from the lips of the guilty testimony believed necessary to administer a variety of acts.[5] By the date of the *Monia* decision, Congress had, foresightedly, added to the standard immunity clause, drawn from

---

[5] See *Shapiro* v. *United States, supra,* p. 6; *Heike* v. *United States,* 227 U. S. 131, 142.

the Interstate Commerce Act, the provision that the witness must claim his privilege.[6] By this addition the statute on compulsory testimony as to this requirement was put on a parity with the constitutional privilege against self-incrimination. It is such a supplemented immunity statute that we are called upon to apply in this case.

Petitioner was compelled to testify at the examination under the Price Control Act.[7] He was subpoenaed and put under oath. At the beginning of the examination, he raised a question as to the validity of the subpoena so as to assure himself that he was not voluntarily present. He promptly declared: "I want to claim privilege as to anything that I say." In response to the examiner's queries as to his and Daisart's business activities, petitioner thereafter made the statements set out at pp. 142 to 145, *supra*. These statements as to the organization of his business, his use of priorities, his suppliers and customers, his banking connections and the method of computing the selling price of surplus materials are clearly more than suggestions from which it might be imagined evidence as to his operations could be obtained. *Brown* v. *Walker, supra,* at 599. Some, at least, of the disclosures, such as the use of blanket priorities of Metals Disintegrating to procure textiles and the method of fixing prices on surplus sales, bore directly on the subsequent charges of misuse of priorities and the goods obtained thereby as well as the charge of conspiracy to violate the Price Control Act. The facts brought out in his examination are not facts disassociated from his prosecution as in *Heike* v. *United States,* 227 U. S. 131, but in the language of the Compulsory Testimony Act are pertinent to the prosecution and "con-

---

[6] *United States* v. *Monia, supra,* at 429; cf. p. 442, *et seq.*

[7] *United States* v. *Monia, supra,* at 429.

cerning which" petitioner testified.[8]  The facts were links in the chain of evidence.  The Government does not contest the conclusion that part of the testimony before the examiner concerns the criminal charges.

*Second.*  The Government, however, contends that petitioner's immunity from prosecution on facts concerning which he was compelled to testify was waived by a subsequent voluntary statement.  This statement as given in question and answer form is set out above at p. 144.[9]

---

[8] In the *Heike* case, the accused had testified in a grand jury investigation as to violations of the Sherman Act.  Such testimony did not earn the immunity of the Act of February 25, 1903, 32 Stat. 854, 904, on a subsequent indictment for a fraud on the revenue by the secret introduction of springs in scales to cause them to indicate less than the actual weight.  A table of annual meltings of sugar had been given at the monopoly investigation by Heike.  This Court said: "The table of meltings by the year had no bearing on the frauds, as it was not confined to the sugar fraudulently weighed and it does not appear how the number of pounds was made up.  The mere fact that a part of the sugar embraced in the table was the sugar falsely weighed did not make the table evidence concerning the frauds.  The same consideration shows that it did not tend to incriminate the witness.  It neither led nor could have led to a discovery of his crime."  227 U. S. at 143.

See *United States* v. *Monia,* 317 U. S. 424, 430; *Brown* v. *Walker,* 161 U. S. 591, 599; *United States* v. *Weisman,* 111 F. 2d 260; *United States* v. *Molasky,* 118 F. 2d 128, 134.

[9] The Government's argument is that voluntary statements are not protected by privilege and do not earn immunity.  It is suggested, too, that the answers were not responsive to the question and that a witness cannot volunteer facts and secure immunity any more than he can secure remission of penalties by appearing as a witness without compulsion.  Further, the Government relies upon the voluntary character of the above statement as a waiver of privilege, not only as to facts included in the statement but also as to similar facts that the witness had disclosed previously under compulsion after claim of privilege.  This position is based on the opinion of the Court of Appeals, where it was said: "Even where this testimony repeated previous answers which would have been subject to the witness' initial general claim of immunity, we see no reason why

Privilege can be waived and with the waiver the statutory immunity disappears.[10] Since the purpose of the remission of penalties is to force out evidence that is protected by privilege against self-incrimination, a waiver of that protection makes the testimony available for prosecution of the witness. Nor do we see any reason why claim of privilege to all or any part of testimony may not be withdrawn. Although the privilege against self-incrimination must be claimed, when claimed it is guaranteed by the Constitution. Thereafter only absolute immunity from federal criminal prosecution is sufficient to compel the desired testimony. Waiver of constitutional rights, however, is not lightly to be inferred.[11] A witness cannot properly be held after claim to have waived his privilege and consequent immunity upon vague and uncertain evidence.

It is plain here that petitioner relied from the beginning of his examination upon his privilege. The United States had notice that the witness sought protection against prosecution for any facts to which he was compelled to testify. The Government had then to decide whether to pay the price to secure the facts of the suspected criminal operation.[12] Just before the question that opened the colloquy quoted at p. 144, the examination had elicited that Daisart often contracted with manufacturers to do work on goods bought and furnished by the manufacturer. Then came the question above

a witness cannot qualify and limit his claim as the examination proceeds, just as he can make new claims as to issues he has not waived." 169 F. 2d at 861.

[10] *Raffel* v. *United States,* 271 U. S. 494, 496, and cases cited; *Vajtauer* v. *Commissioner,* 273 U. S. 103, 113; *United States* v. *Monia,* 317 U. S. 424, 427; *Johnson* v. *United States,* 318 U. S. 189, 195.

[11] *Hodges* v. *Easton,* 106 U. S. 408, 412; *Ohio Bell Tel. Co.* v. *Comm'n,* 301 U. S. 292, 306; *Aetna Ins. Co.* v. *Kennedy,* 301 U. S 389, 394; *Johnson* v. *Zerbst,* 304 U. S. 458, 464.

[12] *United States* v. *Monia,* 317 U. S. 424, 430.

quoted, pp. 143–144, as to the practice on the ammunition-bag contract. The answer, we think, was responsive. Then came the question: "This is a voluntary statement. You do not claim immunity with respect to that state-ment?" And the answer, "No." Whether the "No" ap-plied to the first or second sentence is not known. In view of the specific claim of privilege, it seems unlikely that pe-titioner would waive the privilege and testify, voluntar-ily and without protection against prosecution, as to the details of his operations with Metals Disintegrating, the source of the blanket priorities that lay at the base of the charges by information and indictment. No question is made as to the correctness of the transcription. Without any effort to clarify the "No," the examiner went ahead and had the witness restate the substance of the long answer quoted on p. 144 without any further intimation that the subsequent answers were considered by the examiner to be voluntary.[13] We do not think under these circumstances this equivocal "No" is a waiver of the previous definite claim of general privilege against self-incrimination.

The trial court excluded the entire statement before the examiner, including the question just discussed, as evidence against petitioner. Since that court did not think the statement contained testimony proving any part or feature of the commission of a crime and did not tend to a conviction when combined with proof of other cir-cumstances which others might supply, it refused the motion for a directed acquittal.

Furthermore, before the question was asked the answer to which the Government argues is a voluntary state-ment, petitioner, testifying under unquestioned privilege

---

[13] Compare *United States* v. *St. Pierre*, 128 F. 2d 979, 980: "Nor is it material that appellant stated at several points that he had committed no federal crime; such a contradiction, especially by a nervous or excitable witness would not overcome a clear claim of privilege if he was otherwise entitled to the privilege."

with immunity, gave the information that is detailed above at pp. 141 to 143, inclusive. Without restating the entire substance of the testimony, we think the statements concerning the necessity of Daisart to acquire fabrics for manufacturing, together with information as to the names of the suppliers, the name of Daisart's bank and as to the manner of Daisart's receipts, disbursements and sales prices, were sufficient to give petitioner the immunity claimed.

*Third.* Finally the Government presses upon us the argument that, as to the indictment, the testimony petitioner gave at the examination under the Price Control Act was wholly self-exonerating and therefore did not secure immunity from prosecution by the indictment. The contention is that since the immunity granted by § 202 (g) of the Emergency Price Control Act was an exchange for the constitutional privilege against self-incrimination and since this evidence is not incriminating, it therefore cannot be used to secure immunity from prosecution for conspiracy to violate the Price Control Act. See *Shapiro* v. *United States,* 335 U. S. 1; 8 Wigmore, Evidence, § 2282.

The indictment was for conspiracy to sell finished piece goods in excess of prices fixed under the Price Control Act. The position of the Government is that the only testimony relating to the charge of the indictment is that petitioner testified that he sold the goods at prices within the allowable limits.[14] But the indictment also

---

[14] The testimony referred to is as follows:

"Question: Can you tell me how Daisart Sportswear Inc., arrived at its selling price with respect to the items that it sold?

"Answer: Since it was surplus, it was sold at the price billed to me plus freight and haulage and less discount allowed to me.

"Question: In other words, Daisart Sportswear Inc., sold at cost plus freight less any discounts, cash or otherwise, received by Daisart Sportswear Inc.?

"Answer: Correct."

charged as a part of the conspiracy a plan through false invoices to secure payments for the goods by checks to fictitious persons which the conspirators cashed.

A glance at the details of the testimony set out at pp. 142 through 145, *supra,* will demonstrate that petitioner's testimony at the examination went beyond the exculpatory language concerning the sale price. Petitioner testified as to the business organization of Daisart, its acquisition of materials through the priorities furnished by Metals Disintegrating from named firms on their invoices and its payment for these goods at all times by check. Daisart's bank was named. Since the argument on this point relates only to exculpatory statements and not to waivers, it is also to be noted that all testimony contained in the answer printed on p. 144, above, is to be taken into consideration. Certainly many of these disclosures furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment. Petitioner testified concerning transactions, matters and things substantially connected with parts of the conspiracy for which he was indicted—for example, the testimony that he bought material under invoice from a named supplier and paid for it by check on a named bank. This evidence, being substantially connected with the conspiracy, was ample to give immunity from the conspiracy prosecution. The Compulsory Testimony Act of February 11, 1893, gives immunity from prosecution on account "of any transaction, matter or thing, concerning which" the witness is compelled to testify in return for such evidence. Consequently, we need not decide whether, if only exculpatory evidence was given concerning matters pertinent to the criminal charge, the statute would grant immunity.

*Reversed.*