**UNITED STATES of America, Appellee,**

v.

**William Ludwig ULLMANN, Appellant.**

**No. 260, Docket 23555.**

United States Court of Appeals Second Circuit.

Argued March 16, 1955.

Decided April 4, 1955.

Writ of Certiorari Granted June 6, 1955. See 75 S.Ct. 882.

Nathan Witt and Leonard B. Boudin, New York City (Victor Rabinowitz, New York City, of counsel), for appellant.

J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, New York City (B. Franklin Taylor, Sp. Asst. to Atty. Gen., of counsel), for appellee.

Before CLARK, Chief Judge, FRANK, Circuit Judge, and GALSTON, District Judge.

FRANK, Circuit Judge.

The facts are fully stated in Judge Weinfeld's excellent opinion, 128 F.Supp. 617, the reasoning and conclusions of which we adopt.

It is well to add a few words about defendant's contention concerning the doctrine of Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819, which held that the Fifth Amendment privilege against self-incrimination relates solely to testimony that might lead to defendant's prosecution for a crime. Defendant asks us to modify this doctrine in the light of new circumstances which have since arisen.[1] We are

1. Defendant's brief states the following: "The Internal Security Act (64 Stat. 987 (1950) ), 50 U.S.C. Secs. 74o et seq. [50 U.S.C.A. § 781 et seq.], federal executive orders and current loyalty procedures prohibit the employment of so-called subversives in government or defense facilities and make it unlawful for them to apply for or use passports. If the President declares the existence of 'an internal security emergency,' the Attorney General can intern anyone as to whom 'there is reasonable ground to believe that such person probably will engage in, or probably will conspire with others to engage in, acts of espionage or sabotage.' 50 U.S.C. 812, 813, [50 U.S.C.A. §§ 812, 813].

"Employment as a longshoreman or in the privately owned merchant marine is subject to governmental screening (64 Stat. 428, 1950; 50 U.S.C., Sec. 191 [50 U.S.C.A. § 191]). Since June 1954, the Defense Department has promulgated an elaborate series of security regulations providing for the undesirable discharge of persons inducted into the Armed Forces under the Selective Service Acts [50 U.S. C.A.Appendix, §§ 301 et seq., 451 et seq.] for associations antedating their induction, with the consequent disgrace and economic injury. (See, for example, Department of the Army, Special Regulations S.R. 600–220–1.) It may reasonably be estimated that at least 15 million people are affected by security regulations imposed by the federal government.

"It is inconceivable that the government would license political dissenters to operate radio stations, would give them government contracts, or permit their employment in government jobs, defense plants, or other industries whose employment is controlled or regulated by it. The recently enacted statute which purports to deprive of citizenship persons convicted of Smith Act [18 U.S.C.A. § 2385] violations (Public Law, 83rd Cong., 2d Sess. (1954) [8 U.S.C.A. § 1481(a) (9) ] ) may be the precursor of extension to persons compelled to make such admissions before congressional committees, and grand juries.

"Obviously the immunity statute cannot relieve of these disabilities those who testify pursuant to its provisions. Certainly the Act was not intended to permit those who admit Communist Party membership before a grand jury thereby to become eligible for passports, for employment in the government or in defense facilities, for broadcasting station licenses, for retention in the armed forces and the right to remain outside concentration camps. All of the disabilities created by statute will exist just as effectively whether or not the immunity offered by the statute is, in fact, effective. Therefore, true immunity is not intended nor can it be given by the law. It could

not prepared to say that this suggestion lacks all merit.[2] But our possible views on the subject have no significance. For an inferior court like ours may not modify a Supreme Court doctrine in the absence of any indication of new doctrinal trends in that Court's opinions,[3] and we perceive none that are pertinent here. Accordingly, the argument must be addressed not to our ears but to eighteen others in Washington, D. C.

Affirmed.

be argued, of course, that some of these disabilities might exist upon the basis of secret government information or might arise from the witness' assertion of his constitutional privilege. Without conceding the legality of the disabilities in either case, their existence does not mitigate the forfeiture arising from the compulsory disclosure or show that true immunity is given.

"In addition, there are innumerable state laws and municipal ordinances requiring registration. There are teacher's oath laws for loyalty and security purposes and there are political conditions of employment in state educational institutions and other state agencies. (See, e. g., N. Y. Unconsolidated Laws, Chapter 14 [16]).

"The total punitive impact of these local regulations upon the witness compelled by federal authority to testify is truly terrifying. If the witness, admitting political guilt, is subjected to these local laws, he is receiving a meaningless 'immunity' He has in fact surrendered his right to local employment and his freedom from local harassment by regulation or investigating committee, precisely because of such revelations. This dilemma points up the mockery of the 'immunity' concept in relation to 'subversive activities' today.

"In addition to the formal governmental sanctions, those exercised by the community and by private groups are so tremendous as to challenge an attempt at brief discussion. They include expulsion from labor unions, loss of private employment, discrimination in housing and schooling and public opprobrium.

"These sanctions are not generally regarded in the United States as reason for invoking the constitutional privilege. However, it is significant that in an analogous period of religious oppression, the 13th century, the English equity courts allowed witnesses to be silent where admissions of papacy would result in property loss (Harrison v. Southcote and Morehead, 2 Ves. sen. 389, 28 Eng. Rep. 249, 252 (Ch. 1751), or where ecclesiastical censure would follow (Finch v. Finch, 2 Ves. sen. 49, 28 Eng.Rep. 315 (Ch. 1752), or where a parliamentary seat was at stake. (Honeywood v. Sel-

win, 3 Atk. 276, 26 Eng.Rep. 961 (Ch. 1744)).

"Where the effect of political heresy is as serious as it is today, the dissenter is subject to penalties and forfeitures which, if anything, are more drastic than even criminal prosecution. This is not the place for a complete review of the employment opportunities of a political dissenter in the present political atmosphere. It is sufficient to say that government employment, federal, state or local, is effectively closed to such a person; that employment in a defense plant, in the entertainment industry, in a private educational institution, on a newspaper, in the advertising industry, in the merchant marine, as a longshoreman, and many similar occupations, is effectively closed. Only the most menial and low-paying occupations are now available to many persons who have been branded as subversive by congressional committees, administrative agencies, or the daily press. Indeed, it might well be said that to many such persons the threat of criminal prosecution is the least of the concerns which face a man who is unable to pursue the occupation for which he has been trained.

"The beneficent purpose of the constitutional privilege cannot be achieved unless it is interpreted and applied in the light of the dangers today confronting the witness in a political case. Viewed in context, the statute does not give the witness the immunity to which he is constitutionally entitled."

2. Cf. Taylor, Grand Inquest (1955) 217–221, 296–300; Griswold, The Fifth Amendment Today (1955) 80–81.

3. See Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 217–218;

"Legal doctrines, as first enunciated, often prove to be inadequate under the impact of ensuing experience in their practical application. And when a lower court perceives a pronounced new doctrinal trend in Supreme Court decisions, it is its duty, cautiously to be sure, to follow not to resist it."

See also Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636; Judge Parker's opinion in Barnette v. West Virginia State Board of Education, D.C., 47 F.Supp. 251, 252–253.

CLARK, Chief Judge (concurring).

I concur, but regretfully. For the steady and now precipitate erosion of the Fifth Amendment seems to me to have gone far beyond anything within the conception of those justices of the Supreme Court who by the narrowest of margins first gave support to the trend in the 1890s. And serious commentators have found this new statute peculiarly disturbing in policy and in law. Griswold, The Fifth Amendment Today 80–81 (1955); Taylor, Grand Inquest 217–221, 296–300 (1955); Barth, Government by Investigation 130–134 (1955). It undermines and so far forth nullifies one of the basic differences between our justice and that of systems we contemn, namely the principle that the individual shall not be forced to condemn himself. Practically, as we know, no formal immunity can protect a minority deviator from society's dooms when he departs from its norms. And realistically viewed there is much in the defendant's contention that at the end of the road is a charge of perjury supported by the oath of a renegade or paid informer. Convictions so obtained and punishment thus decreed cannot satisfy either the needs or the ideology of a democratic country committed to respect and toleration for dissident minorities. But I can see no escape from the Supreme Court decisions so carefully analyzed by Judge Weinfeld which, while they stand, are binding on us.

GALSTON, District Judge (concurring).

If this matter were one of first impression I could easily reach the conclusion that the immunity statute in question is in effect a circuitous attempt to circumvent the Constitution by a short-cut legislative statute amending the Fifth Amendment. However, it would appear that the authorities support the contention that Congress has the power to compel testimony by the enactment of an immunity statute which provides an immunity co-extensive with privilege against self-incrimination. Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Smith v. United States, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264. Secondly, that being so, consistently it can be argued that the statute is not invalid for failure expressly to grant immunity from state prosecution. United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210; Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408. See also Jack v. Kansas, 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234.

The good faith of the Attorney General when he acts under 18 U.S.C.A. Section 3486(c) should be assumed.