In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00176-CR


______________________________




DETWONNE MONSHAY ALEXANDER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the Sixth Judicial District Court


Lamar County, Texas


Trial Court No. 22531




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 At Detwonne Monshay Alexander's jury trial in Lamar County leading to his conviction (1) for
delivery of a controlled substance--cocaine between four and 200 grams--in a drug free zone,
Alexander wanted to prominently display a Bible on counsel table in view of the jury, but was
directed by the trial court to keep it in a less prominent position. In this appeal, Alexander asserts
that he was improperly denied his constitutional right to exercise his religion and that he was
convicted on insufficient evidence corroborating accomplice-witness testimony.

 We affirm the trial court's judgment because (1) the trial court did not abuse its discretion in
directing Alexander to move his Bible and (2) sufficient evidence corroborates the accomplice-witness testimony.

(1) The Trial Court Did Not Abuse Its Discretion in Directing Alexander to Move His Bible

 Alexander began trial with his Bible on the counsel table in front of him. When the State
objected, the trial court ordered it put away. Alexander asserts that, in that respect, the trial court
erred and thus infringed his right to the free exercise of his religion. We disagree.

 We analyze questions committed to the trial court's exercise of discretion by inquiring
whether the trial court acted without reference to guiding rules and principles or, stated otherwise,
whether the court acted arbitrarily or unreasonably. (2) See Lyles v. State, 850 S.W.2d 497, 502 (Tex.
Crim. App. 1993). If a trial court's discretionary ruling falls "within the zone of reasonable
disagreement," we must affirm. Wheeler v. State, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002); Allen
v. State, 232 S.W.3d 776, 781 (Tex. App.--Texarkana 2007, no pet.).

 We are required to uphold a decision by a trial court not just on the rationale given for that
decision, but on any lawful basis that justifies that decision. We may uphold a trial court's ruling on
any legal theory or basis applicable to the case, but may not reverse a trial court's ruling on any
theory or basis that might have been applicable to the case, but was not raised. Martinez v. State,
91 S.W.3d 331, 336 (Tex. Crim. App. 2002); cf. Cameron v. State, 241 S.W.3d 15, 18-20 (Tex.
Crim. App. 2007). Thus, if we find that the trial court's decision, to have Alexander move the Bible,
is supportable for any reason, we will find no error.

 Certainly, symbolism is found in and around our courtrooms, and trial courts have the
discretion to allow displays so long as they are not prejudicial to a litigant. See Davis v. State, 223
S.W.3d 466, 475 (Tex. App.--Amarillo 2006, pet. ref'd) (no prejudice shown in trial court's allowing
trial spectators to wear medallions bearing photograph of victim police officer); Green v. State, 209
S.W.3d 831, 834 (Tex. App.--Amarillo 2006, pet. ref'd) (trial court permissibly allowed small,
unobtrusive cross pendant to be worn by prosecutor); Ruckman v. State, 109 S.W.3d 524, 532 (Tex.
App.--Tyler 2000, pet. ref'd) (within trial court's discretion to allow district attorney and assistant
district attorney, during trial, to wear lapel pins supporting children).

 The  trial  court  has  "the  inherent  power  to  control  the  orderly  proceedings  in  the
courtroom . . . ." Allen, 232 S.W.3d at 780; Gonzales v. State, 2 S.W.3d 600, 607 (Tex.
App.--Texarkana 1999, pet. ref'd); see Geders, 425 U.S. at 86. Trial courts have the power and
obligation to control their courtrooms for the purposes of ascertaining the truth, promoting judicial
economy, and protecting witnesses. Trial courts must have certain authority over their courtrooms,
sufficient to

 exercise reasonable control over the mode and order of interrogating witnesses and
presenting evidence so as to (1) make the interrogation and presentation effective for
the   ascertainment   of   the   truth,   (2)   avoid   needless   consumption   of   time,
and  (3) protect witnesses from harassment or undue embarrassment.


Tex. R. Evid. 611(a). Litigants have the right to have cases decided based on the evidence adduced
at trial, not on some other basis. See Holbrook v. Flynn, 475 U.S. 560, 570 (1986); Howard v. State,
941 S.W.2d 102, 117 (Tex. Crim. App. 1996).

 That inherent trial-court power includes restricting conduct or displays that might detract
from an orderly, impartial trial focused on the issues to be tried and the legitimate evidence. In an
unpublished opinion from Minnesota, a trial court was faced with a similar display of a Bible. That
court reasoned that,

 the district court is charged with restricting disruptive conduct at trial, including the
regulation of religious displays. A compelling interest of conducting a trial in a
secular, impartial, orderly manner justified the district court's order. Because the
district court inquired into the purpose of the Bible, had a compelling interest in
conducting an orderly, impartial trial, and allowed appellant to hold the Bible in his
lap, the district court did not err in ordering appellant to conceal his Bible.


State v. Albertson, No. A04-2277, 2006 Minn. App. Unpub. LEXIS 195, at *2-6 (Minn. Ct. App.

Feb. 28, 2006).

 Similarly, in a 1971 case from Florida, a trial court (reasoning that it would introduce an
extraneous factor into the trial) declined to allow a defendant to keep a Bible on the table, noting that
he had developed his interest in religion only after being incarcerated. The court also allowed the
defendant to keep the Bible within his grasp, though requiring him to keep it out of sight. Caldwell
v. State, 243 So. 2d 422, 424 (Fla. Dist. Ct. App. 1971).

 On the other hand, a trial court in Ohio was unimpressed with such an objection by the State
and responded differently: "I'm not going to order that a defendant can't have a Bible in the
courtroom." The objection was overruled, and the trial resumed, with no apparent negative effect. 
State v. Jackson, No. L-07-1184, 2008 Ohio App. LEXIS 1344, at *P18 (Ohio Ct. App. Mar. 31,
2008). Generally, either position--allowing any particular, nongermane display or restricting it--is
within the sound discretion of the trial court in the control of trial proceedings.

 Here, the trial court did not deny Alexander the opportunity to have his Bible near him or
even to read or refer to it if needed during trial. The court merely directed him to keep the Bible in
a place less visible than on top of counsel table. In doing so, the trial court acted within its inherent
authority to conduct orderly, impartial trial proceedings.

 To justify a substantial interference with religious beliefs or practices, the government must
show that it has a compelling interest in doing so. Wisconsin v. Yoder, 406 U.S. 205, 215 (1972);
In re R.M., 90 S.W.3d 909, 912-13 (Tex. App.--San Antonio 2002, no pet.). Alexander suggests
that the trial court's directive was a substantial interference with Alexander's First Amendment right
to the free exercise of his religion. We disagree. 

 Because the record does not demonstrate how the trial court's order interferes with
Alexander's free exercise of religion at all, much less "substantially," this complaint must fail. In
2002, our sister court of appeals in San Antonio was faced with a claim that an order requiring R.M.
to submit to psychoactive medications would interfere with her religious beliefs. The court
examined the testimony in the record and determined that, while R.M. testified she was "very
religious and a devout Catholic" and taking the medication interfered with her reading, writing, or
working to make money--which could be used to get music lessons to help her minister in
song--that evidence failed to prove the medications would substantially burden R.M.'s free exercise
of religion. See id. This record contains no evidence of any burden on Alexander's free exercise of
religion.

 Without proof to the contrary, simply displaying a Bible on the counsel table does not
constitute the "exercise" of religion. This act is nothing more than a particular, easily recognized
book being prominently displayed to jurors.

 We also do not see that this is an issue about the Bible, in particular, or the free exercise of
religion, in general. Imagine that a significant portion of the local population, in the county where
trial was being held, highly esteemed the Boy Scout Handbook, (3) which, by its cover, was easily
recognizable by most jurors at a distance. Imagine further that the State's attorney, a former Boy
Scout, wanted to display his well-worn Boy Scout Handbook prominently on counsel table, in a jury
trial that did not particularly involve that book. Contents of the Handbook could very well be helpful
in guiding the State's attorney in acting admirably and with virtue, if he used the Handbook's
teachings. But would the trial court have the discretion to require the State's attorney to put the book
in a less prominent position so as not to risk improperly influencing the jury? Undoubtedly. In
doing so, would the trial court in any way interfere with the State's attorney's right to conduct himself
according to the teachings of the Handbook? Certainly not.

 The record contains no showing that Alexander's religious practices or beliefs required him
to prominently display his Bible during trial. Nor is there any evidence that he had it for reference
or even for comfort. The record suggests only that he wished to display it passively to the jury.

 Further, the record suggests that the trial court's order did not deny Alexander access to his
Bible any time he wanted to use it conventionally, rather than as a mute statement to the jury. The
order was issued for the purpose of conducting an orderly trial, so that the jury would be
uninfluenced by factors external to the evidence adduced.

 Alexander asserts that the effect of the order was to make him choose between the exercise
of two constitutional rights: his right to remain silent and his right to exercise his religious beliefs. 
The State argued that displaying a Bible on the table in front of Alexander equated to testimony;
thus, the State suggested, with some level of concurrence by the trial court, that displaying the Bible
that prominently might have waived Alexander's Fifth Amendment right to remain silent. We see
no possibility of waiver here.

 An effective waiver of a fundamental constitutional right requires an "intentional
relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464
(1938); In re Bryan, 645 F.2d 331, 333 (5th Cir. 1981). "Courts indulge every reasonable
presumption against waiver of a fundamental right . . . ." United States v. Shea, 508 F.2d 82, 85 (5th
Cir. 1975).

 Implicit, or "testimonial," waiver of the privilege against self-incrimination can be inferred
from a witness' prior statement concerning the subject matter in question, but such waiver will not
lightly be inferred and will be resisted by every reasonable presumption. Klein v. Harris, 667 F.2d
274, 287 (2d Cir. 1981) (citing Emspak v. United States, 349 U.S. 190, 198 (1955); Smith v. United
States, 337 U.S. 137, 150 (1949)). Even if display of a Bible could be considered Alexander's
"statement," it could not be considered to be a statement on the subject matter of the trial.

 One could as well argue that it was testimony for the defendant to wear a particular type of
clothing, or as suggested by appellate counsel, to have a particular type of facial hair, or a pony tail. (4) 
Testimony, by definition, is sworn, oral communication made by a witness at trial, or in affidavit or
deposition. See Black's Law Dictionary 1514 (8th ed. 2004). The presence of a book on counsel
table does not constitute testimony. Thus, the court's directive based on that theory is not
supportable. (5)

 The State has directed our attention to an unpublished Minnesota appellate decision as
support for its position. See Albertson, 2006 Minn. App. Unpub. LEXIS 195, at *2-6. The case is
not on point. Although the facts are quite similar, Albertson does not stand for the proposition that
display of the Bible constituted some form of testimony. In that case, a trial court refused to allow
a defendant to keep his Bible in a visible location, but not on the basis that it constituted testimony.

 This instance of the trial court's control of its courtroom is within its sound discretion. 
Finding no abuse of the trial court's discretion, we overrule this point of error.


(2) Sufficient Evidence Corroborates the Accomplice-Witness Testimony

 Alexander also contends the evidence is insufficient to support his conviction because the
testimony of Brittany Brown, an accomplice, was not adequately corroborated.

 The test for adequate corroboration is whether, after excluding the accomplice's testimony,
there is other evidence of an incriminating character which tends to connect the defendant with the
commission of the offense. Castillo v. State, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The
other evidence needs only to link the accused to the commission of the crime and allow "rational
jurors [to] conclude that this evidence sufficiently tended to connect [the accused] to the offense." 
Malone v. State, 253 S.W.3d 253 (Tex. Crim. App. 2008).

 The record reveals this story. Confidential informant, K.H., was wearing a "wire" and was
to make a drug buy from Brown. K.H. and Brown met at a local store and together drove to a
roadside rendezvous point, where a person in a gold Chevrolet Suburban met them. Brown went to
the passenger seat of the Suburban, and the occupant of the Suburban gave her a single bag
containing what was later proven to be cocaine. As the Suburban pulled away and police attempted
to stop the vehicle, Brown went the opposite direction. Brown returned to K.H.'s home, and police
met them there.

 Brown, found by the trial court to be an accomplice, gave authorities the cocaine and
identified Alexander as the driver of the Suburban, that is, the seller of the cocaine. When police
stopped the Suburban, its driver got out and successfully eluded police.

 The question before us is whether sufficient evidence, beyond Brown's testimony, connects
Alexander to the sale of cocaine.

 The Suburban was registered to Alexander and his wife, Lameca Edwards. The officer who
stopped the vehicle, David Rowton, said that its driver met the general physical description of
Alexander, but that he could not positively identify him.

 The police also recovered a cell phone that was left in the Suburban. Edwards was the
telephone's owner. Edwards' cell phone memory indicated several calls received from Brown's cell
phone and several text messages matching text messages on Brown's telephone, the most crucial of
which occurred during the time period that K.H. and Brown were together the evening of the offense. 
The relevant text messages compiled from the telephones tell the story of the text messages sent and
received between Brown's telephone and Edwards' telephone between 8:09 p.m. and 8:34 p.m. the
evening of the drug buy in question:

 From Brown at 8:09 p.m.: "Are u almost ready"

 To Brown at 8:10 p.m.: "Yeah"

 From Brown at 8:16 p.m.: "When we meet im gettin in with u becuz me and this
other girl from work are gettin this together where u
want to meet me"

 

 To Brown at 8:17 p.m.: "Ok.who u wth" 

 From Brown at 8:22 p.m.: "Cum on I am waitin on u"

 To Brown at 8:23 p.m.: "ok.gve me 5min.im gttn it 2gthr nw"

 To Brown at 8:25 p.m.: "Hw do u wnt it. solid r n 2pcks"

 From Brown at 8:26 p.m.: "Ok hurry please"

 From Brown at 8:29 p.m.: "Solid u ready"

 To Brown at 8:31 p.m.: "Yeah meet me on austin&5th by st. joseph"

 To Brown at 8:34 p.m.: "U wil c me on 5th.tke a rght"

 This exchange provides some evidence that Brown was to obtain the drugs from the person
she was meeting who was in the Suburban and was using Edwards' telephone to communicate. The
person using Edwards' telephone identified him- or herself as "Det"--a "street name," according to
an officer's testimony, used by Detwonne Alexander. There is testimony from the officer who failed
to capture the fleeing suspect in the Suburban, that the suspect matched Alexander's general
appearance. The vehicle was registered in the names of Alexander and Edwards. The telephone
used by the suspect in the Suburban belonged to Edwards. 

 Viewed as a whole, we conclude this evidence tends to connect Alexander to the alleged
offense and therefore sufficiently corroborates the testimony of the accomplice, Brown. We overrule
this point of error.





 We affirm the judgment.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: February 20, 2009

Date Decided: March 11, 2009


Publish 
1. Alexander was sentenced to sixty years' imprisonment.
2. See Geders v. United States, 425 U.S. 80, 86-91 (1976) (abuse-of-discretion standard
applies because trial court "must meet situations as they arise and to do this must have broad power
to cope with the complexities and contingencies inherent in the adversary process").
3. The Court should not be misunderstood as saying that the Bible is equivalent to the Boy
Scout Handbook, though both are highly valued by many in our society and contain excellent
teachings. The Court is simply attempting to analogize.
4. Almost invariably, when police officers appear in court, either testifying or as interested
observers, they appear in their uniforms. Under the State's argument in this case, one could equally
take the position that their appearance in such specific and identifiable clothing constitutes a form
of testimony. We also agree with Alexander's suggestion that a defendant priest would surely not be
required to remove his clerical collar, or a rabbi his yarmulke. Although such a display would reflect
a religious belief, it is simply not testimony for Fifth Amendment purposes.
5. Long-standing caselaw holds that a person may not be required to surrender one
constitutional right to assert another. Simmons v. United States, 390 U.S. 377, 394 (1968); Avila v.
State, 856 S.W.2d 260, 261 (Tex. App.--El Paso 1993, pet. ref'd).



eneral operations, but should, instead, focus on the right of control over the activity
or condition that actually caused the injury. The specific question at issue was whether an oil
company owed a duty to protect a tenant service station's employees from the criminal acts of third
parties. Under the facts in that case, Exxon leased a full-service gasoline station to Jerry Morgan,
who then hired Terry Tidwell as an attendant; Tidwell was later shot during a robbery attempt on the
premises and suffered gunshot wounds to his face and arm. Id. at 20.
            In its analysis, the court cited an earlier opinion expressly adopting Section 414 of the
Restatement (Second) of Torts in support of the rule that "[o]ne who retains the right of control or
exercises actual control over the work of an independent contractor also owes a duty of reasonable
care to the contractor's employees." Id. at 21 (citing Redinger, 689 S.W.2d at 418; Restatement
(Second) of Torts § 414 (1965)). The court, however, limited the application of this principle
when it stated:
[T]he nature of the matters to which the right of control extends [is] determinative. 
We think that in a case alleging negligence in maintaining a safe workplace, the
court's inquiry must focus on who had specific control over the safety and security
of the premises, rather than the more general right of control over operations. Issues
concerning control over operations . . . obscure the true inquiry. The focus should
be on whether Exxon had the right to control the alleged security defects that led to
Tidwell's injury. If Exxon did not have any right to control the security of the station,
it cannot have had any duty to provide the same. If Exxon had such a right of
control, on the other hand, its conduct may be found to have contributed to Tidwell's
injury. Applying the traditional test of right of control over general operations simply
does not answer this question. It requires a factfinder to surmise a general right of
control from factors unrelated to safety, and then to infer from that general control
a right of control over the safety conditions that are the real issue in the case.

Id. at 23. This is precisely what Hagins' estate attempted to do in submitting a question
encompassing any exercise of supervisory control by E-Z Mart over Lance.
            While it is clear that Texas caselaw supports narrowing the issue of actual control to whether
a general contractor retained or exercised control over the activity or condition causing the injury,
Lawrence, 988 S.W.2d at 226, we are concerned with the rather strict narrowness of the issue
presented to the jury in this case. Nevertheless, regardless of whether it was proper to ask the jury
to consider the issue of E-Z Mart's control over fall protection, the jury ultimately found E-Z Mart
negligent, determined its negligence proximately caused Hagins' injuries, and assessed its
proportionate responsibility. Therefore, any error in the submission of question one was thereby
rendered harmless. We therefore overrule points of error one and two.



Jury Question Two: E-Z Mart's Duties
            In its third point of error, Hagins' estate contends the trial court erred in submitting question
two of the jury charge because it failed to properly instruct the jury regarding E-Z Mart's duties,
resulting in jury confusion and error in answering questions one and three. Hagins' estate cites no
law on this point, but complains that the jury should have been provided dual instructions on
negligence and ordinary care because E-Z Mart filled both the role of premises owner and general
contractor. The trial court, instead, submitted only those instructions relating to E-Z Mart's role as
premises owner. Because a "general contractor in control of the premises is charged with the same
duty as an owner or occupier," Olivo, 952 S.W.2d at 527, both have the duty to use reasonable care
to make and keep the premises safe. Id.; Koko Motel v. Mayo, 91 S.W.3d 41, 45 n.5 (Tex.
App.—Amarillo 2002, pet. denied); Redinger, 689 S.W.2d at 417. Even if failure to submit both
sets of instructions constituted charge error, in light of the jury's affirmative finding of E-Z Mart's
negligence, we fail to see how any such error could have been harmful. See Marze, 61 S.W.3d at
456.
Evidentiary Sufficiency
            In its fourth and fifth points of error, Hagins' estate complains the jury's answers to questions
one and three were against the great weight and preponderance of the evidence. In support of this
position, Hagins' estate argues that the jury's answers were manifestly unjust because the evidence
demonstrates that the only fault attributable to Hagins was his failure to watch where he was
stepping, whereas E-Z Mart actually exercised control of the premises, knew of the unsafe platform
used by Lance employees, and approved of the platform's use. 
            When a party challenges the factual sufficiency of an adverse jury finding on an issue where
it had the burden of proof at trial, we review and weigh all of the evidence, both for and against the
issue, setting aside the verdict only if the evidence supporting it is so weak or the finding is so
contrary to the great weight and preponderance of the evidence that it is clearly wrong and manifestly
unjust. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); Cain v. Bain, 709 S.W.2d 175,
176 (Tex. 1986). If it sets aside the verdict, "the court of appeals must 'detail the evidence relevant
to the issue' and 'state in what regard the contrary evidence greatly outweighs the evidence in support 
 
of the verdict.'" Francis, 46 S.W.3d at 242 (quoting Pool v. Ford Motor Co., 715 S.W.2d 629, 630
(Tex. 1986)).
            Returning to the earlier discussion of retained control and Harrison, Hagins' estate maintains
that E-Z Mart's actual control of the premises was established by the evidence. Unlike the present
case, however, the Harrison court concluded a general contractor actually retained the right to
control fall protection because it assigned one of its employees to oversee and routinely inspect its
subcontractor's employees and their proper use of fall-protection equipment. Harrison, 70 S.W.3d
at 784. The evidence also suggested that this supervisor personally witnessed and approved of the
subcontractor's use of specific fall-protection systems, despite knowing of the subcontractor's failure
to comply with established safety procedures relating to their use. Id. In this case, the evidence
shows that one of E-Z Mart's employees, Danny Harrington, signed the building permit in the
capacity of general contractor and was similarly identified on job specifications, but does not suggest
he maintained any of the type of control over safety that led the Harrison court to conclude control
had actually been retained. Evidence of the potential or possibility of control is not evidence that
actual control is exercised or retained. Lawrence, 988 S.W.2d at 226. It is simply not enough that
Harrington could have stopped work if he felt someone was in jeopardy or that he could have
requested a change in procedure had he considered conditions to be blatantly unsafe. 
            In order for E-Z Mart to have any duty of care under the circumstances, it must necessarily
have exercised control beyond mere general or supervisory control, extending its influence over the
operative detail of Lance's work to such an extent that Lance would not have been free to perform
the work in its own way. Harrison, 70 S.W.3d at 793 (Hecht, C.J., concurring) ("[T]he right of
control must . . . extend to the 'operative detail' of the contractor's work . . . and to the injury-producing activity itself."). The Texas Supreme Court has also said that "a general contractor or an
employer is [not] required to stand idly by while another is injured or killed in order to avoid
liability" and "the liability rules [do not] contemplate putting those who employ independent
contractors in that position." Mendez, 967 S.W.2d at 358 (quoting Welch v. McDougal, 876 S.W.2d
218, 224 (Tex. App.—Amarillo 1994, writ denied)).
            The evidence supporting the claim that E-Z Mart retained control over the operative details
of Lance's work is weak at best. Hagins' estate points out that, before the accident in question,
Harrington directed a Lance employee to weld a bracket on a gas pipe and asked another to hang a
door. After the accident, Harrington instructed that rails should be installed on the platform


 and
asked an employee to come down from the top of a ladder. Although these facts present some
evidence of control by E-Z Mart, they certainly are not so overwhelming as to undermine the jury's
conclusion that E-Z Mart did not retain control.



            In addition, it appears that the evidence supporting the jury's response to question three,
apportioning sixty percent of the responsibility for the accident to Hagins himself, thirty percent to
Lance, and ten percent to E-Z Mart, is more than sufficient. The determination of negligent parties'
proportionate responsibility is a matter soundly within the jury's discretion, and, after the jury's
finding that Hagins, Lance, and E-Z Mart were all negligent and that their negligence proximately
caused Hagins' injuries, it is not the place of this Court to substitute its judgment for that of the jury,
even if a different percentage of allocation could be supported by the evidence. Rosell v. Cent. W.
Motor Stages, Inc., 89 S.W.3d 643, 659–60 (Tex. App.—Dallas 2002, pet. denied) (explaining 
Section 33.033 of Texas Civil Practice and Remedies Code affords juries "wide latitude in . . .
allocating responsibility for an accident"); Samco Props., Inc. v. Cheatham, 977 S.W.2d 469, 478
(Tex. App.—Houston [14th Dist.] 1998, pet. denied).
            Although Hagins' estate argues E-Z Mart failed to prove Hagins was contributorily negligent,
it makes this claim only tangentially and as part of its factual insufficiency point of error respecting
the jury's response to question three. Not only did the safety consultation expert for Hagins' estate
testify on cross-examination that Hagins was at least partially at fault, but counsel for Hagins' estate
also said in closing arguments that he believed the question relating to Hagins' own negligence
should be answered affirmatively, even suggesting a fifteen percent allocation of responsibility. The
evidence further demonstrated that it was an unsafe work practice for Hagins to use the platform
while positioned at an angle (leaving approximately three feet of open space between one side of the
platform and the wall on which he was working) and that it had been Hagins' decision not to make
an attempt to reposition the platform so that it would be flush against the wall.


 In light of the fact
that Hagins and his coworkers had been trained in safety practices and knew the hazards associated
with working above ground without safety harnesses, it is not unreasonable to conclude, based on
the evidence presented, that jurors could find Hagins himself was the person most responsible for
his injuries.
Negligent Hiring
            In its sixth point of error, Hagins' estate contends the trial court erroneously granted E-Z
Mart's motion for summary judgment on the issue of negligence in hiring. That is, E-Z Mart should
be liable to Hagins' estate for negligently hiring Lance despite its routine violations of regulations
and use of hazardous workplace procedures, including the failure of its employees to wear safety
lines when working above ground. 
            Under the doctrine of negligent hiring, the basis of liability "is the master's own negligence
in hiring or retaining . . . an incompetent servant whom the master knows, or by the exercise of
reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk
of harm to others." Wise v. Complete Staffing Servs., Inc., 56 S.W.3d 900, 902 (Tex.
App.—Texarkana 2001, no pet.). An employer who negligently hires an incompetent or unfit
individual, therefore, may be directly liable to a third party whose injury was proximately caused by
the employee's negligence. Golden Spread Council, Inc. v. Akins, 926 S.W.2d 287, 294 (Tex. 1996). 

 
Hagins, however, as an employee of the independent contractor itself, cannot be considered a third
party to which E-Z Mart may have owed a duty.
            In analyzing the scope of the phrase "third party" as used in the context of negligent hiring,
the Fifth District Court of Appeals determined that it did not include the employees of independent
contractors. Rogers v. Pro-Tec Installations, Inc., No. 05-96-00049-CV, 1997 Tex. App. LEXIS
3829, at *30 (Tex. App.—Dallas July 24, 1997, no pet.) (not designated for publication). Although
the court was unable to cite any cases definitively stating whether an independent contractor's
employees are third parties for the purpose of considering liability in negligent hiring, it pointed out
that Texas law clearly holds that an independent contractor's employee is not considered a third party
in strict liability cases. Id. (citing Hammack v. Conoco, Inc., 902 S.W.2d 127, 131 (Tex.
App.—Houston [1st Dist.] 1995, writ denied); Gray v. Baker & Taylor Drilling Co., 602 S.W.2d 64,
67 (Tex. App.—Amarillo 1980, writ ref'd n.r.e.)). Seeing no reason why the phrase should be
interpreted differently in relation to negligent hiring, the court ultimately held that a general
contractor cannot be liable to an independent contractor's employee on the ground of negligent
hiring. Rogers, 1997 Tex. App. LEXIS 3829, at *31. We agree.
Conclusion
            Having determined (1) the trial court did not abuse its discretion in submitting questions one
and two, (2) the evidence was factually sufficient to support the jury's findings, and (3) E-Z Mart's 
 
 
motion for summary judgment with regard to negligent hiring was appropriately granted, we affirm
the judgment of the trial court.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          January 22, 2004
Date Decided:             February 6, 2004